USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-2277 UNITED STATES OF AMERICA, Appellee, v. FRANKLIN DELANO LOPEZ, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jose Antonio Fuste, U.S. District Judge] ___________________ ____________________ Before Selya and Boudin, Circuit Judges, ______________ and Lisi,* District Judge. ______________ ____________________ Nathan Z. Dershowitz with whom Amy Adelson, Alan M. Dershowitz _____________________ ____________ ___________________ and Dershowitz & Eiger, P.C. were on briefs for defendant. __________________ ____ William C. Brown, Appellate Section, Criminal Division, ___________________ Department of Justice, with whom Guillermo Gil, United States ______________ Attorney, was on brief for the United States. ____________________ December 14, 1995 ____________________  ____________________ *Of the District of Rhode Island, sitting by designation. BOUDIN, Circuit Judge. Franklin Delano Lopez was ______________ convicted on seven counts charging him with white collar criminal offenses under federal law. In this appeal, able counsel on both sides have briefed a host of issues, several of which pose difficult and important questions. We conclude by affirming on two counts and vacating on five others. The case is remanded for resentencing on the two affirmed counts and for retrial on the five vacated counts, if sought by the government. I. BACKGROUND Lopez was tried under a superseding indictment returned on February 18, 1994. Counts 1 through 5 charged him with making false representations to federally insured banks, 18 U.S.C. 1014, to influence loans to Lopez and his businesses, Four Winds Rental, Inc., and Multi-Media Television, Inc. Counts 6 and 7 charged Lopez with wire fraud, 18 U.S.C. 1343, based on Lopez' withdrawal of over $300,000 from the reserve accounts of certain limited partnerships managed by Lopez through Four Winds Rental, Inc. The jury trial began on June 6, 1994. The government's evidence on the first five counts aimed to show that Lopez made false statements or submitted false documents to obtain loans, or extensions of loans, on five occasions. Three involved substantial sums borrowed from First Federal Savings Bank; another, a loan extension from -2- -2- Chase Manhattan; and the last, a loan from Banco Central. In each instance the alleged misinformation concerned the value or existence of collateral to secure the loan, and the facts differed in each instance. No description of the events is necessary to our disposition of these false statement counts. The two wire fraud charges, reflected in counts 6 and 7, related to a different matter, namely, Lopez' withdrawal of over $300,000 from reserve accounts of certain limited partnerships that owned multi-unit, federally subsidized housing projects in Puerto Rico. Four Winds managed and had a very small ownership interest in each partnership, the balance being held by other limited partners represented by Capital Management Strategies, Inc., a Rockville, Maryland, real estate syndicator. The properties were financed by the Farmers' Home Administration, which restricted the use of the funds in the accounts to specific purposes, primarily repairs and improvements. The gist of the government's charge was that in 1988 Lopez had withdrawn the sums in question from these accounts without the required permission and had created false invoices on the letterhead of a construction company to account for the withdrawals. The government offered evidence that Lopez had created the invoices in amounts matching the withdrawals, that no such construction work had ever been performed, and that the invoices were nevertheless supplied -3- -3- to auditors to explain the withdrawals. The wire element related to two faxes, allegedly sent by Lopez to Capital Management Strategies in late 1990 and early 1991, responding to its inquiry as to the purpose of the withdrawals and the existence of the required approvals by Farmers' Home Administration. About two weeks into the trial, on the evening of June 22, 1994, Lopez was rushed to a hospital emergency room with serious symptoms. Within a day, the trial judge took testimony from the emergency room internist and, shortly thereafter, heard from a court-appointed cardiologist. Later tests revealed that Lopez was suffering a small brain lesion or tumor which was serious but, if properly treated, was not likely to be life threatening. The doctors agreed that the tumor had to be removed but not on an emergency basis, and surgery was scheduled for August. These events caused a recess of the trial from June 22 until July 6, at which time a hearing was held to consider motions by Lopez' counsel for a mistrial based on the lack of competency or for a continuance for purposes of treatment. The thrust of Lopez' objections was that medications prescribed for him caused side effects that interfered with his ability to proceed. Relying partly on the advice of the court-designated neurologist, Dr. Charles Payne, the court -4- -4- denied the motions, and Dr. Payne was ultimately placed in charge of prescribing medications. The same objections were thereafter renewed several times but denied. There were further examinations by Dr. Payne and testimony by him that Lopez was alert, could understand the charges and assist his lawyers, and was not being compromised by the prescribed medications. From July 11 through July 13, Lopez testified in his own defense. On July 18, the jury convicted Lopez on all seven counts. Thereafter, the district court rejected a post-trial motion directed to competency. It had earlier refused to order an investigation into alleged prosecutorial misconduct in the initiating of the prosection. Following the trial, Lopez remained on bail and underwent surgery for the removal of the tumor. On November 17, 1994, Lopez was sentenced to a prison term of 63 months, based primarily on loss calculations that are challenged by Lopez on appeal. Motions for continuation of bail pending appeal were denied by the district court and by this court. See 18 U.S.C. 3143(b)(1)(B). Lopez is currently serving ___ his sentence. II. MEDICAL ISSUES On this appeal, Lopez' first and most dramatic claim is that he was forced to continue his trial while afflicted with a life-threatening brain tumor and while requiring a whole -5- -5- battery of medications to cope with various symptoms. These medications, Lopez suggests, interfered with his ability to remember, concentrate and present himself credibly, and undermined his trial testimony. He further asserts that the trial judge effectively compelled him to accept such medications and, without basis, charged him with malingering or attempting to over-medicate in order to frustrate the trial. Although these are the core factual allegations, the legal claim presented has an unusual twist. Lopez does not _____ claim that he was "incompetent" to stand trial under the ordinary rubric, see Godinez v. Moran, 113 S. Ct. 2680, 2685 ___ _______ _____ (1993), or that his health would be so damaged by the trial that it would be inhumane to continue. Instead, relying primarily on Riggins v. Nevada, 504 U.S. 127 (1992), Lopez _______ ______ says that the trial court "instead of choosing a less intrusive alternative--a halt in the proceedings so that Lopez could have surgery--violated Lopez' constitutional rights by imposing a `regime' of medication that so impaired Lopez' abilities that he was unable to testify coherently on his own behalf." Riggins, which the government says was not relied upon _______ in the district court, contains language colorably pertinent to this case, but involved a fundamentally different issue. Riggins was tried for murder and, as eight Justices viewed -6- -6- the facts, the trial court required Riggins to continue taking a powerful antipsychotic drug generically known as thioridazine. Riggins' claim to the Supreme Court, after his conviction and death sentence, was that he had been compelled unconstitutionally to take this medication and that the drug concealed his true mental state from the jury and impaired his ability to present his insanity defense. The Supreme Court held that Riggins had a substantial interest under the Due Process Clause of the Fourteenth Amendment in "avoiding involuntary administration of antipsychotic drugs . . . ." Id. at 134. Although the Court ___ said that forced medication could sometimes be justified (e.g., to protect the defendant's health or protect others ____ from danger), the trial judge in Riggins had made no such _______ findings. For this reason, and given the "strong possibility" or "substantial probability" that Riggins' defense had been impaired, id. at 137-38, the Court declined ___ to require a showing of actual prejudice and overturned the conviction. The concern in Riggins with forced medication is not _______ present in this case. Although Lopez points to the trial court's threat to revoke bail and imprison him so that a doctor could supervise his medication, the incident had nothing to do with forcing on Lopez any medication that he did not want. The trial court thought that some of the -7- -7- symptoms of which Lopez was complaining (e.g., grogginess) ____ had been induced by over-medication; at the outset a number of doctors were prescribing different drugs, and testimony showed that over-medication might be the cause of such problems. The record shows that Lopez himself wanted proper medicationandwascontent tohaveDr.Payneprescribe andsupervise. This does not mean that Lopez is without a potential claim. That claim, made below and adequately presented here in the course of the Riggins argument, is that the _______ medications, necessary even if voluntarily taken, impaired Lopez' ability to present his defense. Even assuming Lopez' "competency," that being a fairly easy test to satisfy, Godinez, 113 S. Ct. at 2685, the threat of impairment _______ permitted a request for a continuance. Here, Lopez argues, the district court had a reasonable alternative that should have been adopted, namely, to postpone the trial until the operation had occurred and removed or diminished the need for drugs. A defendant, especially one proposing to testify at trial about complex financial transactions, is entitled to be concerned about his fitness. For good medical reasons, Lopez was taking a number of medications, some capable of producing side effects that could impair clarity of mind. The drugs were designed to prevent seizures, control blood pressure, relieve pain, induce sleep, reduce agitation and -8- -8- prevent depression; and they included Darvocet, ProSom, Dilantin, Vasotec, Valium, Esgic Plus and Sinequan. At various times Lopez reported that he had severe headaches, was unable to sleep, and was suffering from memory lapses. His lawyers protested that Lopez had problems communicating with them. Lopez' health obviously warranted an inquiry by the trial judge. Far from ignoring the issue, the trial court deferred trial for a substantial period, summoned medical experts one after another, took an active role in securing diagnoses for Lopez, had him re-examined repeatedly, and took testimony and made findings in abundance, including a detailed post-trial order summarizing the court's findings and reasons for proceeding with trial. There is no need to describe the procedural steps in detail because Lopez himself does not seriously suggest that the investigation was flawed or inadequate. The substantive issue is more difficult. The testimony of the various doctors confirms that a number of the drugs Lopez took have the potential to cause side effects such as grogginess that could interfere with defendant's ability to present his case. Yet the main thrust of the doctors' testimony, fairly read, was that the doctors thought that proper prescription and careful monitoring would meet these threats. Such a monitoring regime was in place when Lopez -9- -9- testified. The doctors who gave testimony raising the most doubts did so at the outset (while several doctors were prescribing drugs for Lopez, apparently without much coordination). Lopez' main trial counsel did protest at times that his client was not able to cooperate fully; but these complaints of Lopez' conduct during trial are balanced, if not outweighed, by the district court's findings that Lopez appeared to be well oriented and was cooperating with counsel. In all events, a reputable expert unaffiliated with the prosecution or defense--Dr. Payne--gave firm testimony that Lopez was fit to testify. His testimony was based on examinations of Lopez close in time and on the monitoring of his medicine. Even on a cold record, Dr. Payne's testimony carries conviction. As for Lopez' own testimony, which he claims suffered because of his medical condition, the evidence is inconclusive. It is not the most organized and responsive testimony we have ever read; but Lopez was confined by evidentiary rulings that limited him in presenting information that he and his counsel thought helpful but the trial judge thought irrelevant (e.g., such as whether the ____ banks had sustained actual losses). Much of the disarray in his testimony appears to be caused by such struggles between Lopez and the court. -10- -10- We have no doubt that Lopez in addition was under great stress. This is true for many criminal defendants, but surely it was augmented here by the tumor. In a few instances Lopez' initial medication caused some adverse side effects while it was being adjusted. On the other hand, the trial had already progressed for several weeks before Lopez' emergency room visit, and much of the medication was directed to medical symptoms--difficulty in sleeping, high blood pressure, anxiety--that could easily have continued even if the trial had been delayed and the tumor removed. The medical advice itself largely supported the course followed by the district court. This is a classic instance in which the district court had to exercise its informed judgment. In such cases, so long as sound procedures are followed, the court's ultimate judgment is reviewed under an abuse of discretion standard. United States v. Zannino, 895 F.2d 1, 13 (1st Cir.), cert. ______________ _______ _____ denied, 494 U.S. 1082 (1990). Whether to proceed with the ______ trial or await the operation may well have been a hard question. But on appeal, we think it easy to conclude that the trial judge acted within his discretion in deciding, with expert medical support and after careful investigation, to proceed. We reject the suggestion that the district court was hostile to the defendant. Most judges are suspicious of a -11- -11- mid-trial request for a continuance or mistrial, and the record confirms that Lopez' initial symptoms may have been caused in part by over-medication, even if inadvertent or the product of too many doctors. Paragons may exist among trial judges who can maintain perfect discipline with perfect tact; but for most, a certain sternness in manner and an abiding skepticism about delay are a necessary part of the arsenal. III. THE MERITS Counts 1-5. The first five counts of the indictment __________ charged Lopez under a statute that punishes anyone who "knowingly makes any false statement" to influence federally insured financial institutions. 18 U.S.C. 1014. The indictment charged, and the district court assumed, that materiality was an element of the offense. But, as was commonly done in most circuits at the time, the trial judge resolved the materiality issue himself and did not submit it to the jury. The defense objected to this procedure. Following Lopez' conviction, the Supreme Court decided United States v. Gaudin, 115 S. Ct. 2310 (1995). There, the _____________ ______ Court held that where materiality is an element of an offense, it must under the Sixth Amendment be submitted to the jury. The government's main response to Gaudin is that ______ materiality is not an element under section 1014. Alternatively, the government says that any error was -12- -12- harmless because the evidence overwhelmingly proved materiality and no rational jury could have found otherwise. This court has already held that section 1014 requires "that the false statement concern[] a material fact. United ______ States v. Concemi, 957 F.2d 942, 951 (1st Cir. 1992). This ______ _______ view is consistent with that of several other circuits. E.g. ____ United States v. Wells, 63 F.3d 745, 750 (8th Cir. 1995); _____________ _____ United States v. Staniforth, 971 F.2d 1355, 1358 (7th Cir. ______________ __________ 1992). Although the statute does not contain an explicit materiality requirement and the Second Circuit has held that no such requirement is to be inferred, United States v. ______________ Cleary, 565 F.2d 43, 46 (2d Cir. 1977), cert. denied, 435 ______ _____ ______ U.S. 915 (1978), we are not disposed to regard the issue as an open one in this circuit.  The government's alternative position is that any error that occurred in failing to submit the issue to the jury was harmless. Most errors, including constitutional ones, are subject to harmless error analysis, Sullivan v. Louisiana, ________ _________ 113 S. Ct. 2078, 2081 (1993), simply because it makes no sense to retry a case if the result will assuredly be the same. But for various reasons, some errors are deemed fatal without proof of prejudice. No one, for example, would think it was harmless error--no matter how conclusive the evidence of guilt--if the defendant were tried by a jury of five year olds or in a courtroom dominated by a lynch-mob. -13- -13- The Supreme Court has gone somewhat beyond such extreme cases, holding (for example) that a defective reasonable doubt instruction objected to at trial cannot be harmless error. Id. at 2082-83. The precedents make clear that it ___ could not be harmless error for the trial judge to direct a verdict on the case as a whole, United States v. Martin Linen _____________ ____________ Supply, Co., 430 U.S. 564, 572-73 (1977); and we think that ___________ the Court would apply the same analysis to a directed verdict on a single element of the offense. Rose v. Clark, 478 U.S. ____ _____ 570, 581 n. 8 (1986); Hoover v. Garfield Heights Municipal ______ ___________________________ Court, 802 F.2d 168, 177-78 (6th Cir. 1986), cert. denied, _____ _____ ______ 480 U.S. 949 (1987). We stress that it is of crucial importance to us that Lopez made a timely objection at trial to the judge's refusal to submit this issue to the jury. This court has already indicated that where there is no timely objection, the "plain error" doctrine (see United States v. Olano, 13 S. Ct. 1770, ___ _____________ _____ 1777-78 (1993)), governs in deciding whether failure to submit an element to the jury calls for reversal. United ______ States v. Romero, 32 F.3d 641, 652 (1st Cir. 1994). See also ______ ______ ________ Gaudin, 115 S. Ct. at 2322 (Rehnquist, C.J., concurring). ______ The mix of considerations is very different where the trial judge has not been alerted by an objection. Indeed, the element may be one that the defendant has chosen not to contest. -14- -14- Even where a timely objection has been made, as in our own case, one might ask why the failure to submit an element to the jury should automatically be fatal, given that the harmless error doctrine can be invoked (not always successfully) in kindred cases, say, to remedy a misinstruction as to an element, Pope v. Illinois, 481 U.S. ____ ________ 497, 502 (1987), or a faulty presumption, Rose, 478 U.S. at ____ 579-80. But labels like "fundamental," id. at 577, and ___ "structural," Sullivan, 113 S. Ct. at 2083, tend to be ________ surrogates for matters of degree and for multiple concerns. In all events, our best guess is that the Supreme Court would regard an omitted element reversible error per se if there ______ were a timely objection--although not automatically "plain error" if no objection occurred--and this conclusion almost disposes of the government's fallback position. We say "almost" because the government could argue that the jury, although instructed not to, actually did decide the materiality issue when it found that Lopez did intend to influence the bank loans by false statements. In theory, the question of purpose (the defendant's specific intent) differs from the question of materiality (whether an objective lender would be likely to be influenced by the statement). Purpose could exist without materiality, and vice versa. But in most cases no independent proof exists of a defendant's specific -15- -15- intent; rather, the jury infers such purpose from the fact that the statement would so influence an ordinary lender. The government hints at this argument in its brief but makes no effort to show that in this case the jury must have so reasoned, a conclusion that might require a showing both that the evidence of materiality was overwhelming and that other evidence of purpose was thin or absent. If an adequate showing were made, we would have to decide whether it would satisfy the Supreme Court. There is some reason to think that it might, see Sullivan, 113 S. Ct. at 2082, but it will ___ ________ be time enough to consider this question in a case where the factual predicate is adequately developed. Counts 6 and 7. Lopez' attacks on the wire fraud ________________ convictions remain to be considered. In his opening brief, Lopez challenged the wire fraud convictions on three grounds: that the evidence did not show a scheme to defraud; that the use of the wires was not in furtherance of such a scheme; that in any event there was no proof that Lopez was responsible for any such use of the wires. We address the points in the same order. First, Lopez says that the evidence does not show that there was a scheme to defraud. He argues that the government did not show that the withdrawals from the reserve accounts were diverted to his personal use or that they were directly linked to the false invoices; and he says that the -16- -16- partnerships owed him money in excess of anything withdrawn and that as a general partner he had authority to withdraw funds. These arguments peel apart into distinct factual and legal issues. Starting with the facts, the government apparently did not prove at trial where the withdrawn money went. But it did show that Lopez' withdrawals matched false construction- company invoices in the same amounts and that Lopez had prepared the invoices, together with false checks on the accounts purporting to pay the invoices. Absent other evidence, the jury was entitled to infer that Lopez had employed the false documents to disguise the withdrawals and divert them to his own use. This is enough for a scheme to defraud without proof as to where he concealed the proceeds or how he spent the money. Cf. United States v. Yefsky, 994 ___ _____________ ______ F.2d 885, 892 (1st Cir. 1993). As for the legal defenses, Lopez as manager apparently could withdraw funds for proper purposes, but the jury reasonably concluded that the purpose here was illicit. Nor is it pertinent that the partnerships may have owed Lopez money. The accounts in question here were restricted to repairs and other narrow uses; and, more important, the records Lopez created gave the impression that the money had been used for repairs. The scheme, if successful, would have -17- -17- enriched Lopez without reducing the ventures' apparent _______ obligations to Lopez. Second, Lopez says that the evidence did not show that the wires--the basis for federal jurisdiction--were used in furtherance of the scheme. The money, he notes, was withdrawn in 1988; and the faxes, responding to inquiries about the withdrawals, occurred in late 1990 and early 1991. Lopez concludes that if any fraud occurred, it was completed long before the faxes were ever sent. No other use of wires was alleged. The case law requires that the use of the wires must be "incident to an essential part of the scheme," Pereira v. _______ United States 347 U.S. 1, 8 (1954), but the cases have ______________ stretched that concept to include use of the wires in attempts "`to lull the victims into a sense of false security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely.'" United States v. Lane, 474 U.S. ______________ ____ 438, 451-52 (1986) (quoting an earlier decision). It is hard to see why the jury could not find that the faxes in this case do not fit that description. Lopez says that the faxes do not explicitly refer to the withdrawals and that they refer to events after 1988 and so could not justify the withdrawals. But the faxes were sent in response to inquiries that did refer to the withdrawals ___ -18- -18- and it is not a complete answer to say that the faxes were not directly responsive to the inquiries. Rather, the responses could be read as attempts to talk around the issue, to confuse matters, and ultimately to delay or avoid detection. This permissible inference satisfies the Lane ____ criterion. Third, Lopez says that the government failed to prove that he sent the December 1990 fax (count 6) or that the January 1991 document (count 7) was transmitted by wire. The former was sent from the accounting firm used by Four Winds Rental and an accountant testified that he faxed the letter as a "courtesy for . . . Mr. Lopez" because "either he or someone from his office was in--in our office that day." The letter is not signed but the accompanying cover sheet, prepared by the accounting firm, says that the letter is from Lopez. Quite apart from the cover sheet, the content of the letter reveals that it is a response to the earlier letter of inquiry to Lopez. The wording of the letter is substantially the same as the subsequent letter of January 14, 1991, which was signed by Lopez. It was a fair inference that Lopez had also composed the earlier letter and either directed the accountant to fax it or sent someone in his employ to do so. All that is required is that Lopez caused the letter to be faxed and the jury could find that he did. -19- -19- As for the January 1991 letter, Lopez does not deny authorship but questions the proof that it had been faxed. The letter was found in the files of Capital Management Strategies together with a page bearing the phrases "Telefax Communication" and "Fax Cover Sheet" as well as the Four Winds logo; and the page describes Lopez as the sender and bears the same date as the letter. This is adequate circumstantial evidence that the document was faxed and serves to distinguish United States v. Srulowitz, 785 F.2d ______________ _________ 382 (2d Cir. 1986), where no circumstantial evidence showed that a letter found in a file had been mailed to a third party. Lopez contends in his reply brief that the Gaudin ______ decision also requires reversal of his convictions for wire fraud. The government charged that Lopez had used interstate wires in furtherance of a scheme to obtain money by means of false representations, thereby violating 18 U.S.C. 1343. Lopez says that such false representations must be material and that it was error not to so instruct the jury and require it to find materiality. The government says that this issue was not preserved, but Gaudin is a recent and not entirely ______ predictable decision. On the merits, Lopez' argument confronts an initial difficulty. In United States v. Faulhaber, 929 F.2d 16, 18 ______________ _________ (1st Cir. 1991), this court found no materiality requirement -20- -20- in the substantially identical federal mail fraud statute, 18 U.S.C. 1341, stating that the jury was not required to find that the scheme would have defrauded a person of "ordinary prudence and comprehension." Faulhaber's position is at odds _________ with some circuits and with both of the standard instruction treatises. E.g., United States v. Dunn, 961 F.2d 648, 651 ____ _____________ ____ (7th Cir. 1992); 1A L. Sand, J. Siffert, W. Loughlin & S. Reiss, Modern Federal Jury Instructions 44.01 (1995). But ________________________________ whether Faulhaber warrants re-examination is a subject for _________ another occasion. In our case, the district court did instruct the jury ___ that a "scheme to defraud" required that the "plan [be one] reasonably calculated to deceive persons of ordinary prudence and comprehension by means of false or fraudulent pretenses, representations, or promises." This language embodies the materiality standard. The only deceptive conduct charged under counts 6 and 7 involved false or fraudulent documents, so it hardly matters that the "reasonably calculated" and "ordinary prudence" language referred to the word "plan" rather than the false statements. In short, assuming that materiality is an element in wire fraud, the issue was effectively submitted to the jury in this case. IV. GOVERNMENT MISCONDUCT -21- -21- Before trial, Lopez filed a motion alleging government misconduct and seeking to have the indictment dismissed, or at least to obtain additional discovery and an evidentiary hearing. He claimed that he was a victim of vindictive and selective prosecution and that the indictment had been tainted by a conflict of interest on the part of a former Assistant United States Attorney who had played a minor role in the investigation of Lopez and later served for a period as Lopez' defense counsel prior to indictment. The district court denied this motion. United States v. Lopez, 854 F. _____________ _____ Supp. 41 (D.P.R. 1994). We start with the claim of improper prosecution. Lopez told the district court that he had been prosecuted because he refused to use his political influence in favor of the reappointment of a former U.S. Attorney for Puerto Rico. Further, he claimed that defendants in his position are normally pursued civilly on false statement claims, so the prosecution was selective as well as vindictive. His evidence on the first point was thin; on the second, the government offered the district court evidence that Lopez' case did fall within its guidelines for criminal prosecutions because of the amounts involved. On appeal, Lopez has condensed his argument on the claim of improper prosecution to a couple of sentences and a pair of footnotes. The arguments are used primarily to add color -22- -22- to his other claim of government misconduct, relating to the _____ dual role of the lawyer who allegedly represented first the government and then Lopez in the same matter. Arguments not seriously developed on appeal are waived, Zannino, 895 F.2d _______ at 17, and in this instance we also think that a deliberate, and reasonable, strategy choice was made. Nevertheless, those charges of selective and vindictive prosecution indirectly concern the integrity of the judicial process. We have therefore reviewed with care the pertinent filings in the district court, the district court's lengthy discussion of the subject, what little Lopez has to say about the matter on appeal, and the government's more extensive rebuttal. Although the waiver relieves us of the need to set out the facts in detail, we comment briefly on each branch of Lopez' claim. The district court did not ignore the serious charges of blackmail made against certain members of the U.S. Attorney's office, but analyzed the proffered evidence with care. This evidence consisted primarily of hearsay and conjecture, and the district court after scrutiny found it insufficient to require an evidentiary hearing. Lopez, 854 F. Supp. at 45- _____ 46. The district court's judgment call was not unreasonable on its face, especially where as here the vindictive prosecution claim falls outside the narrow area where such a claim traditionally has been recognized, e.g. United States ____ _____________ -23- -23- v. Garza-Juarez, 992 F.2d 896, 905 (9th Cir. 1992), cert. ____________ _____ denied, 114 S. Ct. 724 (1994), and where the prosecution ______ itself was conducted by a new U.S. Attorney not implicated by Lopez' allegations. As for selective prosecution, the district court asked the government for information about its prosecution policy. The government supplied the data and the court ruled that Lopez had not made out a colorable claim of discriminatory treatment. Id. at 44. Nor is it surprising to us that the ___ government would prosecute criminally a charge of multiple false loan applications totalling a considerable sum. The government-misconduct claim that Lopez does argue at length on appeal concerns Luis Plaza Lopez. According to the allegations, Plaza, while serving as an Assistant United States Attorney, began the grand jury investigation of Lopez in February 1992, and took a small number of steps in the inquiry before leaving the government in November 1992. Plaza then began representing Lopez in dealing with the government's investigation. Lopez asserts that he did not know of Plaza's prior role in his case. Plaza ceased representing Lopez a year later, before Lopez was indicted, after a new United States Attorney raised questions about Plaza's dual role. If after leaving the government Plaza worked on the other side of the same matter, this would normally constitute -24- -24- a violation of federal law. See 18 U.S.C. 207. But ___ ordinarily the injured party would be the original client, here the government, which would be entitled to fear that confidential information might now be used against it by its own former lawyer. The district court made this point in declining to convene an evidentiary hearing on this matter. Lopez, 854 F. Supp. at 49. _____ Lopez responds by saying that he was himself prejudiced because Plaza must have carried into his new employment his prosecutor's judgment that Lopez was guilty. Lopez cites us to case law holding that, for just this reason, a judge cannot sit on a matter on which he worked as a prosecutor. United States v. Arnpriester, 37 F.3d 466, 467 (9th Cir. _____________ ___________ 1994). The analogy is not very persuasive. The judge, who is supposed to be impartial, is disqualified because his prior connection with one side renders his present impartiality suspect. An attorney is expected to be loyal, not impartial, and after switching sides has ample inducement to act in the interest of the attorney's new client. ___ But--Lopez counters--in this case Plaza, while serving ____ as Lopez' attorney, told Lopez that the government prosecutors might drop charges if Lopez supported one of them for the then open post of U.S. Attorney. The implication is that Plaza was working as an agent for prosecutors, thus depriving Lopez of his constitutional right to independent -25- -25- counsel. Assuming that Plaza ever conveyed such a message to Lopez, Plaza's role was that of a go-between and was apparent to Lopez. The suggestion that Plaza therefore had divided loyalties or was a government agent is rhetoric.  Lopez' most straightforward complaint is that the prosecutors, when they discovered that Plaza was now appearing on Lopez' side, should have immediately disclosed to Lopez Plaza's prior involvement as prosecutor in the same case. Lopez cites us to cases where the government has by its silence improperly reaped an advantage from disloyal acts of private defense counsel in cooperation with the government. E.g., United States v. Marshank, 777 F. Supp. ____ ______________ ________ 1507 (N.D. Cal. 1991). But there is no indication that the government gained any advantage from delay in disclosing Plaza's former affiliation, if undue delay there was. The main job of the trial judge in a criminal case is to try the defendant, and there is always a tension when the defense seeks to shift the focus to charges of improprieties or wrongdoing by the government. Where there are plausible claims of government misconduct prejudicing the rights of the defendant, the district court cannot ignore them; but how far to pursue them, and in what manner, depends upon circumstances, and the judge on the scene has considerable latitude. United States v. Ortiz-Arrigiotia, 996 F.2d 436, _____________ ________________ 442-43 (1st Cir. 1993), cert. denied, 114 S. Ct. 1368 (1994). _____ ______ -26- -26- Here, the trial judge looked about for big fish, saw none, and let the red herrings go.  V. SENTENCING Lopez was sentenced pursuant to the November 1, 1990, edition of the Sentencing Guidelines (all subsequent references are to that edition). The seven counts of conviction were grouped, U.S.S.G. 3D1.2, and Lopez' sentence was calculated under section 2F1.1, which prescribes a base offense level of 6 for offenses involving fraud or deceit. The main variable under section 2F1.1 is the amount of "loss" inflicted or intended, and the district court calculated the total loss for the seven counts as $6,689,051, requiring an increase of 14 levels. U.S.S.G.  2F1.1(b)(1)(O). The district court added six additional levels, representing two levels each for more than minimal planning, id. 2F1.1(b)(2), abuse of a position of trust, ___ id. 3B1.3, and obstruction of justice for committing ___ perjury during trial, id. 3C1.1. ___ The resulting total base offense level was 26 (6 plus 14 plus 6). Lopez had no prior convictions and, given a criminal history category of I, his offense level of 26 corresponds to a guideline range of 63 to 78 months' imprisonment. The court chose to construct the 63-month sentence by imposing concurrent sentences of 24 months on -27- -27- count 1 (the conduct underlying this count occurred when an earlier version of section 1014 was in effect that provided for a two-year maximum sentence), 63 months each on counts 2 through 5, and 60 months each on counts 6 and 7 (there being a 60-month statutory maximum on those last two counts). Lopez has not challenged the base offense level or the six-level adjustment for planning, abuse of trust or obstruction. He does challenge the loss calculations on counts 1 through 5, and on certain of his claims the government suggests a remand. Having reversed convictions on those false statement counts, we have no reason to consider the claims of error as to sentences on those counts. Our concern is limited to Lopez' separate attacks on the calculations as to counts 6 and 7. The broader of the two challenges made by Lopez to his sentence on counts 6 and 7 is that the government failed to show either an actual or an intended loss to the partnerships because Lopez was charged with having improperly withdrawn $308,481 from the partnerships' reserve accounts in 1988 and the same year the partnerships allegedly owed Lopez $741,000. Lopez' brief reasons that the "withdrawal of monies that were owed to him . . . did not cause the partnerships any `actual' economic loss," nor can there have been any intended loss because "here, the alleged crime was complete yet there still was no loss." The argument is clever but unpersuasive. -28- -28- If a defendant had picked the pocket of a victim in a crowded elevator, gaining $10 in the process, it would not be a defense when the $10 loss figure was attributed to the defendant at sentencing to say that the victim happened to owe the defendant an even larger sum. As long as a theft or diversion is concealed or disguised, the victim has no reason to think that its debt has been reduced. In this sense the loss caused by Lopez was both actual and intended. Lopez' second argument is less ambiguous but may have more substance. It is common ground that the amount withdrawn by Lopez from the partnerships' reserve accounts was $308,481. This was the amount charged in the indictment and, interestingly, it is the figure specified by the district court in its order requiring restitution, an order that Lopez has not challenged. Yet in reliance on the probation report, the district court found a loss of $436,176 attributable to the wire fraud counts; and as we shall see the difference between the two figures may matter. The probation officer originally calculated the loss on counts 6 and 7 as $308,481 but thereafter a letter containing a victim impact statement was received from Capital Management Strategies claiming a loss of $632,917. The probation officer deducted various amounts from this larger figure concluding that they did not reflect losses imposed by Lopez. The amount left was $436,276, which the probation -29- -29- officer and the district court adopted as the loss attributable to counts 6 and 7. The victim impact statement was not attached to the pre-sentencing report so the basis for the claimed total loss of $632,917 is difficult to discern. At sentencing, the discrepancy between the original and adjusted figures for the loss on counts 6 and 7 did not loom large, since both figures were dwarfed by the losses on counts 1 through 5; whether the loss of counts 6 and 7 was $308,481 or $436,176, the total loss on all counts appeared to be within the $5 to $10 million range for which a 14-level increase was required. Nevertheless, at sentencing defense counsel took a swipe at the victim impact statement, calling it "a letter that has been alluded to in the pre-sentence report. No live body, no documentation. . . . and to indicate that there are $436,376 in the losses as a result of that, I believe, is -- is improper." On appeal, Lopez says that the letter in question was not disclosed to him, despite a request, and argues that the trial judge "failed to exercise independent judgment but relied mechanically on a non-disclosed hearsay document referred to very generally in the pre-sentence report . . . ." The government responds that in this circuit reliable hearsay can be used at sentencing, including hearsay adopted by a pre-sentence report. See United States v. Tardiff, 969 ___ _____________ _______ -30- -30- F.2d 1283, 1287 (1st Cir. 1992). Lopez then says that the victim impact statement had no indicia of reliability, a point difficult to resolve since it is not before us. It is not necessary to decide these issues in the abstract because the case must in all events be remanded for resentencing. The bulk of the losses, and thus a significant part of Lopez' sentence on counts 6 and 7, rests on amounts attributed to the counts that we have reversed. The government has not given us any reason to think that the losses for counts 1 through 5 can be attributed to Lopez in a resentencing on counts 6 and 7. The possibility that it may retry Lopez on counts 1 through 5 is irrelevant at present. The base offense level for counts 6 and 7 and the six- level increase have not been challenged on appeal, so the only question is the amount of loss. The difference between the two alternative figures here is significant; the $308,481 figure would seemingly produce a total offense level of 20 and a sentencing range of 33-41 months, while the larger $436,276 figure would produce a total offense level of 21 and a range of 37-46 months. Although one might construct a technical argument to defend the use of the larger figure (e.g., because Lopez did not counter the report with ____ evidence), we think that simple justice suggests that this is the wrong course to follow, especially since resentencing is required in any event. -31- -31- If on remand the government wants to rely on the larger of the two figures, the victim impact statement should be made available to Lopez' counsel prior to resentencing. Whether the government wants to support the larger figure with any other kind of evidence, and whether Lopez wants to seek an evidentiary hearing at which the maker of the victim impact statement can be cross-examined, are matters for the future. What we will not do is uphold on this record the use of the larger figure where a procedural flaw arguably exists and we ourselves cannot discern the basis for the figure. The convictions and sentences on counts 1 through 5 are vacated; the government may retry the defendant on those _______ counts or not, as it chooses. The convictions on counts 6 and 7 are affirmed but the sentences imposed on those counts ________ are vacated and the case remanded for resentencing on those _______ ________ counts of conviction. It is so ordered. _________________ -32- -32-