UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 96-1132

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD GOLDBERG,

Defendant, Appellant.



ERRATA SHEET

At page 16, line 15, delete ", Michael Kendall," and at page 17,

line 2, substitute "the prosecutor in question" for "Kendall".

UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT



No. 96-1132

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD GOLDBERG,

Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge] 



Before

Boudin, Circuit Judge, 

Bownes, Senior Circuit Judge, 

and Lynch, Circuit Judge. 



Morris M. Goldings with whom David R. Kerrigan and Mahoney, 

Hawkes & Goldings were on brief for appellant. 

Michael Kendall, Assistant United States Attorney, with whom 

Donald K. Stern, United States Attorney, and Kevin J. Cloherty, 

Assistant United States Attorney, was on brief for the United States. 



February 3, 1997



BOUDIN, Circuit Judge. Richard Goldberg was convicted 

of two counts of conspiracy to defraud the Internal Revenue

Service, 18 U.S.C. 371, and eight counts of aiding and

assisting the filing of false income tax returns, 26 U.S.C. 

7206(2). Goldberg's appeal is now before us. We begin by

describing the factual background and proceedings in the

district court.

In the years prior to his indictment in 1995, Goldberg

was involved in several businesses in and around Boston. His

ventures included a billboard company, Logan Communications,

and a partial interest in a "Park 'N Fly" lot located in East

Boston near Logan Airport. Goldberg also owned and operated

Liverpool Lumber, Inc., which Goldberg used as a management

company for various of his other enterprises.

In or around 1988, Goldberg became aware that the

Commonwealth of Massachusetts planned to take all or part of

the East Boston Park 'N Fly lot by eminent domain as part of

its Third Harbor Tunnel project. The planned taking not only

threatened Goldberg's profitable parking business, but also

his billboard company, since many of its signs were located

on the parking lot's land. Goldberg began an intense

lobbying effort against the proposal in 1988, eventually

spending over $1 million of his and his partners' money to

oppose the tunnel plans.

-2- -2-

Two of those hired to oppose the project--community

activist Robert A. Scopa and consultant Vernon Clark--were

named as co-conspirators in the two separate conspiracies for

which Goldberg was ultimately convicted. Taking the evidence

most favorable to the verdict, the facts pertaining to the

two different conspiracies were as follows.

Scopa Conspiracy. From 1990 to 1995, Goldberg employed 

Scopa to help organize the East Boston community against the

tunnel project and to perform other services. But Goldberg

never paid Scopa in Scopa's own name. Instead, Goldberg had

his Liverpool Lumber company issue paychecks to three

successive "straw" employees, none of whom worked for

Goldberg and all of whom agreed to hand the money over to

Scopa. 

To reflect the "wages" of the straw employees, Goldberg

directed his bookkeeper at Liverpool Lumber to prepare

various W-2, W-3, and W-4 reporting statements, which were

then filed with the IRS. These documents falsely described

wage payments to straws who had performed no work for

Liverpool Lumber. The straws, in turn, falsely included the

phantom wages from Liverpool on their own individual returns.

Reporting the money on the straws' returns instead of Scopa's

resulted in a loss of about $150 to the Internal Revenue

Service.

-3- -3-

The government claimed at trial that the scheme was

devised so that Scopa would seem to be unemployed and thus

could continue to collect monthly benefits under a disability

insurance policy. Evidence also indicated that Scopa sought

to hide the payments in order to preserve his status as an

"independent" activist in the East Boston community and to

prevent an extramarital affair from being discovered by his

wife. The district court later found that Scopa, but not

Goldberg, was motivated by all of these objectives. 

Clark Conspiracy. In the course of opposing the Third 

Harbor Tunnel project, Goldberg also retained Vernon Clark, a

lobbyist in Washington, D.C., who performed various services

to this end. Goldberg's companies owed Clark a substantial

sum of money in 1991 for work performed in opposition to the

tunnel project. Rather than pay the bill directly, the two

men agreed with others to a more complicated method for

Goldberg to discharge his debt to Clark.

At the time, Clark was having a secret affair with a

woman named Patricia McNally. The pair occasionally spent

time in a Maine beach house of which McNally was part owner.

Clark sought to fund an expansion of the beach house without

his wife's knowledge. Goldberg agreed to pay the money he

owed to Clark to a landscaping company owned by John Lango,

McNally's brother-in-law, who would in turn construct the

beach house expansion.

-4- -4-

Goldberg arranged for the preparation of two separate

$10,000 invoices to Park 'N Fly from Lango, dated October 15,

1991 and January 1, 1992, respectively. The invoices were

ostensibly for landscaping services, although Lango performed

no work for any of Goldberg's companies. The invoices were

paid by Park 'N Fly. Lango testified at trial that the

payments were structured in two installments so as to reduce

his taxes on the transaction.

The triangular flow of money and services involved the

preparation and filing of several false tax documents. At

Goldberg's direction, Park 'N Fly sent forms 1099-MISC, one

for each $10,000 payment, to the IRS and to Lango. The forms

falsely listed the payments as non-employee compensation to

Lango. Lango in turn reported the payments as income on his

own income tax returns in 1991 and 1992. Clark did not

report the money. The foreseeable tax loss to the IRS based

on this scheme was about $3,000.

A federal grand jury indicted Goldberg on April 6, 1995

for offenses relating to the above activities. The

indictment charged Goldberg with two counts of conspiring to

defraud the United States government, 18 U.S.C. 371,

several counts of aiding and assisting the filing of false

income tax returns, 26 U.S.C. 7206(2), and several counts

of mail fraud based on his alleged efforts to conceal his

-5- -5-

employment of Scopa from the latter's disability insurer. 18

U.S.C. 1341.

After moving unsuccessfully to dismiss the indictment,

Goldberg waived his right to a trial by jury. Goldberg's

trial before the district judge took eight days, and on

September 6, 1995, the court announced its findings. The

court found Goldberg guilty of conspiring to defraud the

government and of aiding and assisting in the preparation of

false tax returns, but acquitted him on the mail fraud

charges on the ground that his motive to help defraud the

insurer had not been proved beyond a reasonable doubt.

At Goldberg's sentencing in December 1995, the district

court made guideline calculations (described below) but then

departed downward two levels and sentenced Goldberg at the

bottom of the range. The result was a ten-month sentence--

five months to be served in prison and five in community

confinement--as well as three years of supervised release and

a $20,000 fine. Goldberg now appeals, challenging his

convictions and sentence.

The most important and difficult issues on appeal relate

to Goldberg's conviction for conspiracy under 18 U.S.C. 371

to defraud the IRS. This type of conspiracy is known as a

Klein conspiracy, taking its name from an earlier case 

involving a complex scheme designed to escape taxes. United 

States v. Klein, 247 F.2d 908 (2d Cir. 1957). Goldberg 

-6- -6-

argues that the district court misunderstood the crime's

"purpose" element and that the evidence did not support a

conviction.

The defraud clause of Section 371 criminalizes any

conspiracy "to defraud the United States, or any agency

thereof in any manner or for any purpose." 18 U.S.C. 371.

Such conspiracies to defraud are not limited to those aiming

to deprive the government of money or property, but include

conspiracy to interfere with government functions. See, 

e.g., United States v. Tarvers, 833 F.2d 1068, 1075 (1st Cir. 

1987). The crime with which Goldberg was charged, therefore,

was that he conspired to interfere with the proper

functioning of the IRS, through the filing of false tax

documents.

It is commonly said that in such a conspiracy the fraud

has to be a purpose or object of the conspiracy, and not 

merely a foreseeable consequence of the conspiratorial

scheme. Dennis v. United States, 384 U.S. 855, 861 (1966); 1 

Sand et al., Modern Federal Jury Instructions 19.02 (1990). 

Consider, for example, the case of a band of bank robbers.

All know that the agreed-upon robbery will generate "income"

that none of the robbers will report. Yet it would be

straining to describe interference with the IRS as a purpose

or object of the conspiracy. E.g., United States v. Vogt, 

910 F.2d 1184, 1202 (4th Cir. 1990).

-7- -7-

This requirement of purpose accords generally with

conspiracy doctrine, United States v. Alvarez, 610 F.2d 1250, 

1256 (5th Cir. 1980), but it is especially important under

the defraud clause of section 371. There are not many

financial crimes without some implications for false

reporting in someone's tax filings, if not for tax liability

itself. If section 371 embraced every foreseeable

consequence of a conspiracy, many joint financial crimes

having no other federal nexus--and perhaps many non-criminal

acts as well--would automatically become federal conspiracies

to defraud the IRS.

The "purpose" requirement, however, is easier to state

than to apply. The laundering of drug money, for example,

normally involves the deliberate concealment of the money's

origin. The primary purpose is almost always to avoid

detection of the underlying crime; but can a jury also find

an implied secondary objective to conceal income from the

IRS? We have held, on specific facts, that a jury could draw

such an inference and also find a violation of section 371.

E.g., United States v. Cambara, 902 F.2d 144, 147 (1st Cir. 

1990); Tarvers, 833 F.2d at 1075-76. 

Such cases are the source of Goldberg's first argument

on this issue. He argues, inventively, that the conspirators

either must have as their primary purpose the aim of

frustrating the IRS or must be agreeing to undertake the

-8- -8-

conduct in question to conceal some other crime. An example

of the first alternative (primary purpose) is Klein itself 

where a web of shell companies and deceptive arrangements was

devised to evade taxes; the second alternative (concealment

of crime) captures the money laundering precedents.

This view of section 371 might explain a number of cases

and create a barrier against overreaching by prosecutors.

But it makes no doctrinal sense. A conspiracy can have

multiple objects, Ingram v. United States, 360 U.S. 672, 679- 

80 (1959), and any agreed-upon object can be a purpose of the

conspiracy and used to define its character. The central

problem, which ought not be shirked, is to distinguish

rationally between cases where interfering with government

functions is a purpose and those where it is merely a 

foreseeable effect of joint action taken for other reasons.

This effort poses subtle problems in discriminating

"purpose" from "knowledge" and in separating the objects of a

conspiracy from its more remote consequences. Volumes could

be written on these subjects but--for cases like ours--a more

compact solution is at hand: where the conspirators have

effectively agreed to falsify IRS documents to misstate or

misattribute income, we think that (depending upon the

circumstances) the factfinder may infer a purpose to defraud

the government by interfering with IRS functions in the sense

endorsed by the Supreme Court in Dennis.  

-9- -9-

It may well be that the conspirators in this case had no

subjective desire--primary or secondary--to throw sand in the 

wheels of the IRS, let alone a subjective aim to reduce tax

liability. Goldberg's argument on this point, with one

qualification as to the Clark conspiracy, may be plausible.

But filing a number of false tax documents misattributing

income can interfere so clearly and proximately with IRS

functions--or at least a factfinder could (but need not) so

find--that we see no sharp distinction under section 371

between a purpose to file such documents and a purpose to

interfere.

In permitting a factfinder to equate the two purposes,

we leave untouched the general precept, namely, that mere

collateral effects of jointly agreed-to activity, even if

generally foreseeable, are not mechanically to be treated as

an object of the conspiracy. This would be a different case

if, without filing false tax documents, Goldberg had agreed

with his partners to pay Jones under the table, knowing that

Jones had no intention of reporting the money to the IRS. If

the difference is in degree, then here the degree matters.

This brings us to the evidentiary question raised by

Goldberg which we rephrase to accord with our just-stated

view of the law: does the evidence in this case show that

Goldberg and at least one other conspirator shared a purpose

to interfere with IRS functions by the filing of false income

-10- -10-

reports with the IRS? This question must be asked and

answered separately as to each conspiracy, as Goldberg was

convicted of two separate conspiracies under section 371 and

each conviction involves a separate assessment.

In each conspiracy, the illicit purpose that gives rise

to section 371 violation must be shared by two or more

conspirators. Although the government's brief stresses the

evidence pertaining to Goldberg's own role and knowledge, a

conspiracy to defraud requires at least two who share that

aim. Innocent third parties may be the unwitting instruments

of a conspiracy. But when it comes to characterizing the

purposes or objects of the conspiracy, it is those that are

shared by at least two co-conspirators that make up the

illegal agreement between them. United States v. Krasovich, 

819 F.2d 253, 255 (9th Cir. 1987).

Here, the district court found that a purpose of the

conspirators, in each conspiracy, was to interfere with the

IRS. As we have said, such a purpose can be inferred,

depending upon the facts, where the very acts agreed to by

the conspirators included the filing of false income-related

tax documents. This purpose can fairly be imputed to

Goldberg who arranged for the creation of several or more

false tax documents in each scheme. The duration and

complexity of the schemes, and Goldberg's own sophistication,

add to the inference.

-11- -11-

There is no evidence that Goldberg discussed the filing

of false tax documents with other conspirators. Yet we think

that such conduct was an integral and self-evident part of

each conspiracy, permitting the inference that other co-

conspirators shared in that purpose. In the case of the

Scopa conspiracy, false W-2s were given to the straws, who

were participants in the scheme, over an extended period.

Scopa himself signed a tax return with his wife, who was one

of the straws, that incorporated a false W-2. 

As to the Clark conspiracy, Lango received the false

form 1099s, and he in turn reported the false figures to the

IRS. Indeed, Lango asked that the amount be divided so that

it could be reported in two different years, testifying later

that Clark had made the suggestion. This indicates a tax

motive but, in addition, shows that both men knew that the

filing of false tax documents was an integral part of the

scheme, and both shared in this purpose with Goldberg. In

sum, the evidence supports the trial court's findings of a

common purpose to interfere with IRS functions.

In addition to "the danger [of injustice] inherent in a

criminal conspiracy charge," Dennis, 384 U.S. at 860, the 

defraud clause of section 371 has a special capacity for

abuse because of the vagueness of the concept of interfering

with a proper government function. For that reason, we have

examined with special care both the concept and the evidence

-12- -12-

in this case. But having done so, we conclude that the

conduct and purpose of the defendants, although markedly less

sinister than in Klein, could properly be found to fall 

within the outer bounds of section 371.

Goldberg next challenges the admission at trial of two

out-of-court conversations between Lango and Clark, in which

they discussed the false landscaping invoices and the

solicitation of Goldberg's participation in the scheme.

These statements were admitted, over Goldberg's objection at

trial, pursuant to Fed. R. Evid. 801(d)(2)(E), which provides

that "a statement by a co-conspirator of a party during the

course and in furtherance of the conspiracy" is not

considered hearsay. 

Goldberg does not dispute that Lango and Clark made the

challenged statements during and in furtherance of the

conspiracy, but he argues that the statements were not

admissible against him because they were made before he

joined. He relies heavily on our opinion in United States v. 

Petrozziello, 548 F.2d 20 (1st Cir. 1977), where we said that 

"if it is more likely than not that the declarant and the

defendant were members of a conspiracy when the hearsay

statement was made, and that the statement was in furtherance

of the conspiracy, the hearsay is admissible." Id. at 23. 

Although this language has been cited with approval in a

few later cases, e.g., United States v. McCarthy, 961 F.2d 

-13- -13-

972, 976-77 (1st Cir. 1992), it conflicts with United States 

v. Baines, 812 F.2d 41 (1st Cir. 1987). Baines expressed the 

traditional notion that--insofar as hearsay is concerned--a

late-joining conspirator takes the conspiracy as he finds it:

"a conspiracy is like a train," and "when a party steps

aboard, he is part of the crew, and assumes conspirator's

responsibility for the existing freight . . . ." Id. at 42; 

accord United States v. Saccoccia, 58 F.3d 754, 778 (1st Cir. 

1995).

Frankly, the underlying co-conspirator exception to the

hearsay rule makes little sense as a matter of evidence

policy. No special guarantee of reliability attends such

statements, save to the extent that they resemble

declarations against interest. The exception derives from

agency law, an analogy that is useful in some contexts but

(as the Advisory Committee noted) is "at best a fiction"

here. The most that can be said is that the co-conspirator

exception to hearsay is of long standing and makes a

difficult-to-detect crime easier to prove. United States v. 

Gil, 604 F.2d 546, 549 (7th Cir. 1979). 

If starting afresh, one might argue that the narrow

Petrozziello version of the exception should be preferred, if 

only because it accords better with the companion rule

imposing substantive liability for other crimes committed

during the conspiracy; a co-conspirator is held liable for

-14- -14-

foreseeable acts of others done in furtherance of the

conspiracy but only if committed during the defendant's

period of membership. United States v. O'Campo, 973 F.2d 

1015, 1021 (1st Cir. 1992). Symmetry is at least convenient.

But we are not starting afresh. The broader Baines test 

describes the traditional approach, United States v. United 

States Gypsum Co., 333 U.S. 364, 393 (1948), presumptively 

adopted by the Federal Rules of Evidence. It is followed in

most circuits. See 2 Saltzburg, et al., Federal Rules of 

Evidence Manual 219-22 (5th ed. 1990) (collecting cases). 

Most important, it is the test in most of our own recent

cases, including Saccoccia, decided only 19 months ago.1 

This panel is arguably not free, but is in any event not

inclined, to depart from Saccoccia. 

Goldberg's next claim on appeal is based on his motion

filed prior to trial asking the district court to dismiss the

indictment on the ground of selective prosecution. The

district court denied the motion without holding a full

evidentiary hearing. Goldberg claims that he alleged facts

sufficient to require a hearing on his complaint, and he now

 

1See Saccoccia, 58 F.3d at 778; O'Campo, 973 F.2d at 
1023 n.5; United States v. Fields, 871 F.2d 188, 194 (1st 
Cir. 1989); United States v. Murphy, 852 F.2d 1, 8 (1st Cir. 
1988); United States v. Anguilo, 847 F.2d 956, 969 (1st Cir. 
1988); United States v. Reynolds, 828 F.2d 46, 47-48 (1st 
Cir. 1987); United States v. Cintolo, 818 F.2d 980, 997 (1st 
Cir. 1987). 

-15- -15-

asks this court to remand the case so that he may have such a

hearing. 

The government is allowed "broad discretion" in deciding

whom to prosecute, Wayte v. United States, 470 U.S. 598, 607 

(1985), but there are some limitations. It is said that the

government may not base its decision to prosecute on an

"unjustifiable standard," including the defendant's exercise

of protected statutory and constitutional rights. Wayte, 470 

U.S. at 608. Goldberg bases his selective prosecution claim

on the theory that he was targeted by the government in

response to his vigorous--and constitutionally protected--

lobbying activities in opposition to the Third Harbor Tunnel

project.

In seeking an evidentiary hearing, a defendant need only

allege "some facts (a) tending to show that he has been

selectively prosecuted and (b) raising a reasonable doubt

about the propriety of the prosecution's purpose." United 

States v. Saade, 652 F.2d 1126, 1135 (1st Cir. 1981). But 

the court may refuse to grant a hearing if the government

puts forward adequate "countervailing reasons" to refute the

charge, id., and if the court is persuaded that the hearing 

will not be fruitful. Review on appeal is for abuse of

discretion. United States v. Gary, 74 F.3d 304, 313 (1st 

Cir. 1996).

-16- -16-

Here, Goldberg alleged that one of the prosecutors on

the case made a comment to Goldberg's counsel during a

preindictment meeting to the effect that Goldberg "should not

have won" his fight with Frederick Salvucci, Massachusetts'

secretary of transportation during the tunnel planning stage.

Goldberg also claimed that the initials "D.D." on a

prosecution file reflect the complicity in the investigation

of David Davis, executive director of MassPort. Finally, he

pointed to the fact that several of his co-conspirators in

the two schemes, including Clark and Lango, were never

indicted. 

The government filed several affidavits to rebut the

claim. It denied that the prosecutor in question made the

alleged statement to Goldberg's attorney. It explained that

the initials "D.D." on the file that raised Goldberg's

suspicion in fact referred not to David Davis but to Denise

Doherty, an FBI agent assigned to the case. In another

district court paper, the government described the origins of

its investigation into Goldberg's activities and gave

examples of other recent prosecutions for mail fraud and

Klein conspiracies. 

The district court ultimately denied a hearing, saying

that Goldberg's claims were "close to conclusory." We have

reviewed the complete filings of both sides and the district

court's explanation. What is involved is a judgment call--

-17- -17-

tempered on appeal by the deferential standard of review--as

to the force and specificity of the allegations, the strength

of the response, and the likelihood that a hearing would be

helpful. United States v. Lopez, 71 F.3d 954, 963-64 (1st 

Cir. 1995). Here, the district court did not abuse its

discretion.

The claim of selectivity was quite weak; the government

largely explained its choice mainly to pursue Goldberg and

Scopa. And the rather modest evidence of wrongful motive

also melted away, leaving only a single dispute. As to this,

four prosecutors denied under oath that the alleged remark

had been made. But it is in any event too thin a reed to

require an evidentiary hearing, given the lack of surrounding

evidence to support a selective prosecution claim.

Even less need be said about Goldberg's later new trial

motion, whose summary denial is also cited as error. In

substance Goldberg complained that the government did not

follow its own internal rules for tax prosecutions or reveal

to him information about this decision. The government's

procedures do not create substantive rights, United States v. 

Michaud, 860 F.2d 495, 499 (1st Cir. 1988), and there is no 

substantial basis for believing that the government withheld

Brady material, Brady v. Maryland, 373 U.S. 83 (1963), let 

alone that its actions were prejudicial.

-18- -18-

Goldberg's last claim of error concerns his sentencing.

In fixing the sentence, the district court enhanced

Goldberg's base offense level of 10, by four levels--two

levels for his role in the offense, U.S.S.G. 3B1.1(c), and

two more levels for obstruction of justice, id. 3C1.1--to 

arrive at an adjusted offense level of 14. (All citations

are to the November 1995 edition of the guidelines).

However, the court departed downward two levels to 12 because

it thought Goldberg's conduct was outside the "heartland"

contemplated by the Klein conspiracy sentencing guideline. 

Id. 2T1.9. 

The district judge stated that although Goldberg's

conduct "as a matter of law constitutes a Klein conspiracy, 

as a matter of sentencing law, it seems to me inappropriate

to apply the Klein conspiracy guidelines." He chose to 

depart downward two levels because he thought the guideline

section for aiding and assisting tax fraud, 2T1.4, with a

base offense level of 8 (when the tax loss is $3,001 to

$5,000), was more reflective of Goldberg's conduct than the

Klein conspiracy guideline, 2T1.9, which has a base offense 

level of 10.2

 

2The ten-month sentence--five months to be served in
prison and five in community confinement--was the minimum end
of the resulting guideline range of 12. U.S.S.G. ch. 5, pt.
A (10-16 months at offense level 12).

-19- -19-

The government, sensibly in our view, has chosen not to

pursue an appeal from the downward departure. But Goldberg,

as is his right, challenges the district court's decision to

impose a two-level enhancement for his managerial or

supervisory role in the Scopa and Clark conspiracies. The

applicable guideline calls for an increase if "the defendant

was an organizer, leader, manager, or supervisor in any

criminal activity." U.S.S.G. 3B1.1(c). In such a case, a

two-level increase applies to joint criminal activity that

involved fewer than five participants and was not otherwise

extensive. Id. 

Goldberg says that the only person he managed or

supervised was his bookkeeper, Arlene Meucci. Meucci, he

argues, does not count under the guideline because she was

not a culpable participant. See United States v. Morillo, 8 

F.3d 864, 872 & n.13 (1st Cir. 1993); U.S.S.G. 3B1.1,

comment n.1. However, at the sentencing hearing, the

district court found that Goldberg "had a management role" in

connection with false payroll and tax documentation directed

to the straw employees in the Scopa conspiracy. 

We review a district court's factfinding at sentencing

under a clearly erroneous standard. United States v. 

Thompson, 32 F.3d 1, 4 (1st Cir. 1994). On the record before 

us, ample evidence shows that Goldberg superintended the

straws' receipt of false tax documents. Goldberg says that

-20- -20-

Scopa and Clark were the true leaders of the two

conspiracies. But a defendant need not be at the top of a

criminal scheme to be a manager or supervisor. United States 

v. Savoie, 985 F.2d 612, 616 (1st Cir. 1993). Here, 

Goldberg's role was sufficient for the enhancement even if we

assume that Scopa conceived of the payroll scheme and may

have exercised primary supervision over the straws.

Affirmed. 

-21- -21-