USCA1 Opinion

 

 April 15, 1996 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 95-1489 No. 95-1768 UNITED STATES OF AMERICA, Appellee, v. G. ROBERT RANDAZZO, Defendant, Appellant. ____________________ ERRATA SHEET ERRATA SHEET The opinion of this court issued on April 8, 1996, is amended as follows: On page 17, line 2, add the word "for" after the word "forth." UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 95-1489 No. 95-1768 UNITED STATES OF AMERICA, Appellee, v. G. ROBERT RANDAZZO, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] ___________________ ____________________ Before Cyr, Boudin and Stahl, Circuit Judges. ______________ ____________________ Morris M. Goldings with whom Sally A. Morris and Mahoney, Hawkes __________________ ________________ ________________ & Goldings were on consolidated briefs for appellant. __________ Carolyn Stafford Stein with whom Jonathan Chiel, Acting United _______________________ _______________ States Attorney, and James B. Farmer, Acting United States Attorney, _______________ were on consolidated briefs for the United States. ____________________ April 8, 1996 ____________________ BOUDIN, Circuit Judge. Robert Randazzo was president _____________ and majority shareholder of New England Shrimp Company ("the Company"), a Massachusetts corporation that imported, processed, and distributed shrimp. In February 1994, a federal grand jury returned a 101-count indictment, charging Randazzo--and in most counts the Company as well--with an array of offenses. The offenses fell into two different categories: 97 "shrimp" charges and four "tax" charges.  The shrimp charges, counts 1 through 97, alleged that Randazzo and the Company used certain substances in producing shrimp that were prohibited or at least needed to be disclosed on labels. The substances increased profits by altering the weight or color of the shrimp, which was sold to the Department of Defense and various commercial purchasers. These allegations underpinned four charges of conspiracy, 18 U.S.C. 371, and 93 substantive counts of making false statements to and claims against the United States, 18 U.S.C. 287, and introducing misbranded or adulterated food into interstate commerce, 21 U.S.C. 331(a), (k) and 333(a)(2). The tax charges, counts 98 through 101, were brought against Randazzo alone and alleged that he had caused the Company to file false corporate tax returns. 26 U.S.C.  7206(1). Specifically, the government claimed Randazzo misreported as sales expenses cash sums that he was taking weekly from the Company for personal use and that the Company -2- -2- returns listed as corporate expenses the wages of a person who worked exclusively for the Randazzo family on personal matters. After a 10-day jury trial in October 1994, Randazzo was convicted on all counts. He was sentenced to 36 months in prison, reflecting a significant downward departure from the Sentencing Guidelines range. He now appeals from his conviction but not his sentence, contending that the trial court erred as to joinder, alleged multiplicity of charges, and instructions. The pertinent facts are set forth as necessary in discussing the separate claims of error. I. JOINDER OF COUNTS  Randazzo claims that joining the 97 shrimp counts with the four tax counts was improper. Fed. R. Crim. P. 8(a) permits joinder of counts against a single defendant only if the offenses "are of the same or similar character," or "are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." The district court rejected Randazzo's motion to sever based on Rule 8(a), and, as the issue turns on a construction of the rule, we review the decision de novo. United States v. Yefsky, 994 F.2d 885, 895 __ ____ _____________ ______ (1st Cir. 1993).  Rule 8(a)'s joinder provision is generously construed in favor of joinder, United States v. Robichaux, 995 F.2d 565, _____________ _________ 569 (5th Cir.), cert. denied, 114 S. Ct. 322 (1993), in part ____________ -3- -3- because Fed. R. Crim. P. 14 provides a separate layer of protection where it is most needed. Under Rule 14, the trial judge has discretion to order severance of counts, even if properly joined under Rule 8(a), to avoid undue prejudice. Here, the district court denied Randazzo's motion for severance under Rule 14 and he has not appealed that ruling. Nevertheless, Rule 8(a) does forbid joinder unless the counts meet one of the conditions already quoted, and those conditions, although phrased in general terms, are not infinitely elastic. One basis for joinder, invoked by the government here, is where the counts involve acts comprising parts of "a common scheme or plan." As the government points out, this rubric is often used to join false statement claims with tax fraud charges where the tax fraud involves failure to report specific income obtained by the false statements. E.g., ____ United States v. Whitworth, 856 F.2d 1268, 1277 (9th Cir. ______________ _________ 1988), cert. denied, 489 U.S. 1084 (1989). Indeed, the _____ ______ failure to report may help conceal the fraud.  The present case is quite different and offers no such connection between the shrimp and tax counts. Randazzo reduced the Company's reportable income by overstating corporate expenses. But it was pure happenstance whether the overstated expenses happened to reduce legal income or illegal income of the Company. The misconduct underlying the -4- -4- shrimp counts and the improper claiming of expenses on the returns were not part of the same "scheme or plan" in any sense of the phrase. Accord United States v. Halper, 590 ______ _____________ ______ F.2d 422, 429-30 (2d Cir. 1978) (rejecting a similar argument by the government).  Alternatively, the government says that the shrimp and tax charges are of the "same or similar character" because (ignoring sales to commercial buyers) both sets of offenses involved the use of falsehoods or omissions to profit at the expense of the federal government. Further, it notes that many facts are common to both sets of charges: for example, they occurred during overlapping time frames; Randazzo's control over the Company was a common element; and the Company's sagging financial condition provided a common motive.  It is obvious why Congress provided for joinder of counts that grow out of related transactions--ones that are "connected" or "part of a common scheme or plan"; the reason for allowing joinder of offenses having "the same or similar character" is less clear.1 But whatever the rationale, we  ____________________ 1The "same or similar" language was drawn from earlier law without explanation. 1 C. Wright, Federal Practice and _____________________ Procedure: Criminal 141 (2d ed. 1982). About the best one ___________________ can say is that in such cases the evidence of one crime is more likely to be independently admissible, on theories reflected in Fed. R. Evid. 404(b), in proving the other, "similar" crime. E.g., United States v. Shue, 766 F.2d 1122, ____ _____________ ____ 1134 (7th Cir. 1985), cert. denied, 484 U.S. 956 (1987). See ____________ ___ also McElroy v. United States, 164 U.S. 76 (1896)(discussing ____ _______ ______________ -5- -5- think that it is very hard to describe adulterating or mislabeling shrimp as offenses "similar" to tax fraud--except at a level of generality so high as to drain the term of any real content. Even the government's best case does not stretch as far as the present facts. United States v. ______________ Levine, 983 F.2d 165, 167-68 (10th Cir. 1992) (bank fraud and ______ mail fraud). As to the presence of evidence common to both sets of counts, we agree that the extent of common evidence plays a role in implementing Rule 8(a). United States v. Taylor, 54 _____________ ______ F.3d 967, 973 (1st Cir. 1995). But Congress did not provide for joinder for unrelated transactions and dissimilar crimes merely because some evidence might be common to all of the counts. Indeed, looking to the important evidence, the _________ shrimp and tax counts in this case seem to revolve around quite different facts.  But all this is largely for the benefit of district courts in future cases, because the misjoinder here was patently harmless. United States v. Lane, 474 U.S. 438, 449 _____________ ____ (1986). The evidence against Randazzo on the tax counts was overwhelming. Randazzo does not seriously claim otherwise but argues that the evidence on the shrimp counts was thin and that the jury was, or may well have been, swayed on those  ____________________ "same class of crime" provision). -6- -6- counts by the evidence (inadmissible save for the joinder) that Randazzo was cheating on taxes.  We disagree, concluding that the government has amply carried its burden to show that the error did not "substantially influence[] the jury's decision." O'Neal v. ______ McAninch, 115 S. Ct. 992, 995 (1995). As to each of the four ________ conspiracies charged in the shrimp counts, at least one high- ranking Company official testified that he had discussed with Randazzo the fact that the given ingredient was prohibited or had to be disclosed, and each testified that Randazzo had nevertheless ordered that the ingredient be added, making clear in several cases the aim was higher profits.  Other evidence showed that Randazzo kept close watch over production and had the final say over the mix of ingredients. In one instance Randazzo learned that another producer had been told to stop using an ingredient and, on investigating the report, Randazzo discovered that the ingredient could be used to change the color of the shrimp to resemble a more expensive variety; he then ordered its use in his own shrimp. Randazzo also played a major role in arranging for the destruction of evidence. The tax counts simply did not matter. II. MULTIPLICITY Randazzo's second claim of error, relating both to the indictment and to the jury instructions, is that the four -7- -7- alleged conspiracies should have been charged as one. He argues that, when coupled with the misjoinder, this multiplicity contributed to the impression that he was criminally disposed. Briefly, these were the four alleged conspiracies: 1. Count 1 charged that Randazzo conspired to make false statements to, and claims against, the government by selling the Department of Defense shrimp containing the chemical sodium tripolyphosphate ("STP"), in violation of contract obligations. STP causes shrimp to absorb and retain moisture, which in turn boosts profits because the shrimp was sold by weight.  2. Count 52 charged that Randazzo conspired to sell to the public shrimp that had been adulterated by adding saccharin, an additive prohibited by federal regulations. The government alleged that the Company added saccharin to mask the taste of the STP.  3. Count 65 charged that Randazzo conspired to add the chemical sodium hydroxide to certain types of shrimp in order to give them a pinkish color. Randazzo then passed off the altered shrimp to customers as naturally pink shrimp, which is rarer than other varieties and commands higher prices.  4. Count 79 charged that Randazzo added STP to the Company's line of frozen raw breaded shrimp, sold to wholesalers and the public, contrary to federal regulations.  -8- -8- It is a recurring question in conspiracy cases whether related illegal agreements comprise one conspiracy or several. Because the agreements are often not explicit and are regularly inferred from conduct, the courts ordinarily treat the issue as one of fact and offer various criteria that might help the factfinder distinguish: these include commonality vel non of the nature, motive, design, ___ ___ implementation, and logistics of the illegal activities, as well as the scope of co-conspirator involvement. E.g., ____ United States v. Boylan, 898 F.2d 230, 241 (1st Cir.), cert. ______________ ______ _____ denied, 498 U.S. 849 (1990). ______ Each of the conspiracies in this case had a different specific purpose; each involved different conduct; and the time periods covered were different. Randazzo makes no effort whatever to dispute these differences in his brief. Rather, he says that all of the agreements concerned the Company's production of shrimp and alleged fraudulent concealment, and he points to some common elements (e.g., ____ that two of the conspiracies related to use of STP--one on military sales and the other on sales to the public). We will assume arguendo that a jury might have found ________ that there was an overarching conspiracy to sell shrimp through various deceptive practices that were altered from time to time. But on the evidence presented, the jury was not compelled to so find, and that is enough. As it happens, -9- -9- such an overarching conspiracy, if it existed, might not preclude the conviction of Randazzo for the individual subsumed conspiracies if they were also proved--an interesting problem that need not be decided here. See ___ United States v. Broce, 488 U.S. 563, 580-81 (1989) (Stevens, _____________ _____ J., concurring). Randazzo continues by arguing that the four charged "overlapping conspiracies" worked special prejudice in this case. He points out that each conspiracy count alleged several different illegal purposes (e.g., count 1 alleged ____ violations of 18 U.S.C. 287, 1001, and 1516). And, he concludes, the conspiracy counts together involved instructions on 17 different offenses. The result, says Randazzo, was "a lengthy and confusing [set of] instruction[s] that the jury could not reasonably be expected to apply."  Jury confusion is a legitimate concern in this case, but it cannot be proved by simply noting the number of offenses. There is no automatic ban on multiple counts in an indictment, or on charging a conspiratorial agreement having multiple unlawful purposes. Braverman v. United States, 317 _________ _____________ U.S. 49, 54 (1942). Randazzo had a chance to show us how specific language or organization of the instructions misled the jury; but his brief points to nothing specific, let alone -10- -10- to any properly preserved objection or request concerning this issue. III. "OTHER CRIMES" EVIDENCE At trial the prosecution introduced some evidence suggesting Randazzo's involvement in previous, uncharged misbranding, adulteration and tax fraud offenses. On appeal Randazzo does not challenge the admission of this evidence. But he claims that the trial court should have given a requested standard instruction that evidence of uncharged crimes may not be considered as evidence of his propensity to commit crimes. Fed. R. Evid. 105, 404; see 3 L. Sand, et ___ al., Modern Federal Jury Instructions 74.03 (1994). ________________________________ The government's response is that most of the evidence characterized by Randazzo as "other uncharged conduct" was "direct evidence of the crimes charged, not Rule 404(b) evidence at all, and thus did not require the limiting instruction defendant proposed." The government includes in this "direct evidence" category the Company's use of sugar and STP in shrimp in years prior to the indictment and evidence of Randazzo's failure to report income (e.g., the ____ cash he took from the Company) on his personal tax returns. ________ In an appendix to this opinion, we set forth the episodes that are arguably in dispute. Our case law does contain such a distinction between "direct evidence" and "other crimes" or "Rule 404(b)" -11- -11- evidence. E.g., United States v. Santagata, 924 F.2d 391, ____ _____________ _________ 393-95 (1st Cir. 1991). Although its soundness has been questioned, E. Imwinkelried, Uncharged Misconduct Evidence  _____________________________ 9.62 (1995), we are not free to disregard circuit precedent. But in reality "direct evidence" and "Rule 404(b) evidence" are not mutually exclusive categories, but loose labels that can sometimes plausibly be applied to the same conduct. And, ____ as usual, below the surface there are problems of policy and of degree. The general rule is that evidence of the defendant's bad acts or crimes, other than those charged in the indictment, is admissible, subject to conditions, if relevant in some way apart from the forbidden inference that the defendant is criminally inclined. Rule 404; see People v. Zackowitz, 172 ___ ______ _________ N.E. 466, 468 (1930) (Cardozo, J.). The standard conditions include the usual balancing of relevance against prejudice, Fed. R. Evid. 403, and use of a limiting instruction telling the jury not to draw the forbidden inference, Fed. R. Evid. 105. See Huddleston v. United States, 485 U.S. 681, 691-92 ___ __________ _____________ (1988). The general rule, and the conditions, may be easily applied where the "other" crimes are reasonably distinct (e.g., in time and place) from the crime charged in the ____ indictment. But where the "other" crimes are more closely entangled with the events that comprise the charged offense, -12- -12- a number of courts have declined to apply the label "other" or to require the limiting instruction. E.g., Santagata, 924 ____ _________ F.2d at 395, (evidence that those charged with drug dealing had been carrying guns). The argument for the distinction made by cases like Santagata is that where the "other" (i.e., uncharged) crimes _________ ____ are closely entangled with the crimes charged, the strength of the permitted inference--e.g., that guns are often used to ____ protect drugs--may effectively submerge the forbidden one. See Rossetti v. Curran, No. 95-1978, slip op. at 13 (1st Cir. ___ ________ ______ March 21, 1996). The argument against the distinction is that sometimes the forbidden "bad character" inference _________ remains a potential menace even in cases like Santagata. _________ Obviously much depends on the crimes involved and on the facts of the individual case. In the present case, at least one or two categories of the "other" crimes described in the appendix were distinct enough from the crimes actually charged that it would have made sense to include a single general limiting instruction in the final charge to the jury.2 Nothing more was sought in this case. Perhaps the safe course for a district court,  ____________________ 2The proof of personal income tax violations is the clearest case. The use of sugar, to the extent it appeared to be a separate wrong, could also be regarded as distinct. The other categories of alleged "other" crimes listed in the appendix are more debatable since they primarily involve aspects of the same charged crime that happened to fall outside the limitations period. -13- -13- wherever the matter is in doubt, is (where asked) to give a closing general instruction that bad character is not a permissible inference. But here a limiting instruction could not have altered the result and omitting it was at worst harmless error. United States v. King, 897 F.2d 911, 915 (7th Cir. 1990). _____________ ____ The most potent "other crimes" evidence related to Randazzo's personal tax offenses; but the evidence against Randazzo on the corporate tax offenses was overwhelming. Conversely, the arguable "other crimes" evidence bearing on the shrimp counts was either very mild or so similar and closely connected to the actual crimes charged as largely to rob it of the independent "bad character" sting which the instruction means to forestall. IV. MATERIALITY Randazzo claims that on six counts, each involving some form of false representation or omission, the trial judge erred in deciding that the statements or omissions were "material" instead of submitting the materiality issue to the jury. Two counts (counts 1 and 65) charged Randazzo with conspiring inter alia to make false statements to the ___________ government in violation of 18 U.S.C. 1001; and the four tax counts (counts 98-101) alleged that Randazzo willfully overstated expenses on the corporate tax returns in violation of 26 U.S.C. 7601(1).  -14- -14- At the pre-charge conference Randazzo said that the materiality issue in count 1 was an issue for the jury. But, as was then common in most circuits, e.g., United States v. ____ ______________ Arcadipane, 41 F.3d 1, 7 (1st Cir. 1994), the trial judge __________ ruled that materiality was for the court and held that the materiality requirement was satisfied as to count 1. We think that she also decided the materiality issue on the four tax counts. As to count 65, the judge did (for unexplained reasons) submit the issue of materiality to the jury. Following Randazzo's conviction in October 1994, the Supreme Court in June 1995 decided United States v. Gaudin, _____________ ______ 115 S. Ct. 2310 (1995), and held that where materiality is an element of a crime, it must be submitted to the jury. In this circuit, both of the offenses in question have been read to include a materiality requirement.3 Accordingly, as Randazzo is entitled to the benefit of the law prevailing at the time of his appeal, Griffith v. Kentucky, 479 U.S. 314, ________ ________ 328 (1987), it was "error" as to five of the six counts in question (counts 1 and 98-101) not to submit the materiality issue to the jury. If the harmless error test were applied, Randazzo would arguably be entitled to a new trial on these counts, even  ____________________ 3Arcadipane, 41 F.3d at 7 (section 1001); United States __________ _____________ v. DiRico, No. 94-1471, slip op. at 7 (1st Cir. March 11, ______ 1996) (section 7206(1)).  -15- -15- though the error did not affect the outcome. This court has held that the failure to submit an entire element to the jury, when a properly preserved request is made, is treated as "structural" and is reversible error without regard to harm. United States v. Lopez, 71 F.3d 954, 960 (1st Cir. _____________ _____ 1995) (reading Supreme Court precedent to point in this direction). Accord, DiRico, slip op. at 12. ______ ______ At the same time, this court observed in Lopez that a _____ Gaudin error would not require automatic reversal if the ______ defendant had failed to preserve the objection at trial. Rather, we said that the test on review would be the customary "plain error" standard under United States v. ______________ Olano, 113 S. Ct. 1770 (1993); Lopez, 71 F.3d at 960. _____ _____ Significantly, every post-Gaudin case we can find in other ______ circuits does apply the plain error test, not the harmless error test, to a failure to submit materiality to the jury (assuming that the objection was not properly preserved).4 Here, Randazzo did not preserve the objection because he failed to object to the instructions on this point after they were given and before the jury retired. See Fed. R. Crim. P. ___ 30. Randazzo says that it was reasonable not to object since  ____________________ 4United States v. Jobe, 1996 WL 101744 (5th Cir. 1996); _____________ ____ United Sates v. DiDomenico, 1996 WL 88431 (7th Cir. 1996); ____________ __________ United States v. Kramer, 73 F.3d 1067 (11th Cir. 1996); ______________ ______ United States v. Keys, 67 F.3d 801 (9th Cir. 1995), reh'g en _____________ ____ ________ banc granted, 1996 WL 111572 (Mar. 11, 1996). But cf. United ____________ ___ ___ ______ States v. Viola, 35 F.3d 37 (2d Cir. 1994), cert. denied, 115 ______ _____ ____________ S. Ct. 1270 (1995) (not involving Gaudin).  ______ -16- -16- First Circuit precedent was dead against him and Gaudin was ______ unexpected. This is so; but the question is whether these circumstances make any difference. In United States v. _____________ Collins, 60 F.3d 4 (1st Cir. 1995), this court squarely held _______ that it does not make any difference, and the post-Gaudin ______ cases in other circuits imply the same view. This result might at first be surprising, but we are dealing with an accommodation of conflicting concerns. Randazzo is not charged with a deliberate waiver of the objection, which might preclude its consideration under any standard. E.g., United States v. Marder, 48 F.3d 564 (1st ____ _____________ ______ Cir.), cert. denied, 115 S. Ct. 1441 (1995); see also Olano, ____________ ___ ____ _____ 113 S. Ct. at 1777. And, although the trial judge in this case acted properly under then prevailing law, Randazzo is given the benefit on direct review of a later change in law-- if he can meet the customary plain error tests that Olano _____ sets forth for unpreserved error. In any event, Collins _______ controls.5 In this case, even assuming the error was "plain" and "affected substantial rights," Fed. R. Crim. P. 52(b), it did not cause a "miscarriage of justice" or seriously affect the integrity or impair "public confidence" in the proceedings.  ____________________ 5Any contrary implication that might be drawn from United States v. London, 66 F.3d 1227, 1239-40 (1st Cir. ______________ ______ 1995), petition for cert. filed, 64 USLW 3511 (U.S., Jan. 18, ________________________ 1996), is at most dictum since the court held that no error had been committed. -17- -17- Olano, 113 S. Ct. at 1779; Keys, 67 F.3d at 811. On the tax _____ ____ counts, the convictions were inevitable. Although Randazzo's brief struggles imaginatively to find a doubt based on the amount of the misreported expenses in comparison with corporate income, the amount (between $45,000 and $60,000 each year) was not trivial or immaterial, even assuming dubitante that amount matters in the case of a deliberate _________ falsification. Compare United States v. Greenberg, 735 F.2d _______ ______________ _________ 29, 31 (2d Cir. 1984). As for the use of STP in shrimp--forbidden by the Company's government contracts--the prosecution offered evidence that STP increased the weight of the shrimp (apparently by more than five percent) and therefore the cost to the government. In fact, the prosecution showed that in one instance where the presence of STP was revealed, the government rejected the Company's shipment. Given the contract ban and the increased cost, the failure to reveal the use of STP was patently material. V. PROCESSING AID  The last issue concerns Randazzo's claim that the court misinstructed the jury on the definition of "processing aid," a term pertinent to the misbranding offense in this case. Count 65 charged Randazzo with conspiring to sell, and counts 66-78 with selling, shrimp that was misbranded; and one of the three forms of misbranding charged (any one sufficed for -18- -18- conviction) was that the label inaccurately failed to list sodium hydroxide as an ingredient. The statute, 21 U.S.C.  343(i)(2), provides that failure to list an ingredient constitutes misbranding unless the omission is exempted by regulation. Sodium hydroxide had clearly been added to the shrimp in question, but it was Randazzo's position that this ingredient did no more than bring out or restore the allegedly natural pink color of the shrimp and that the ingredient was exempted from listing as a "processing aid." The regulation exempting "processing aids" defines them to include the following: Substances that are added to a food for their technical or functional effect in the processing but are present in the finished food at insignificant levels and do not have any technical or functional effect in that food. 21 C.F.R. 101.100(a)(3)(ii)(c). _ In charging the jury, the trial court did not read this quoted language verbatim, although Randazzo had asked for such an instruction. Instead, the court told the jury that the jury could find misbranding if the label failed to list each ingredient but, "if an ingredient is merely a processing aid, it does not have to be listed. However, if the ingredient has a functional or technical effect on the product, such as changing its color, it is not a processing aid and it must be listed as an ingredient." -19- -19- Following the charge, the court invited objections. Randazzo did not object to the failure to read the verbatim definition of processing aid, and the omission was not plain error. See Fed. R. Crim. P. 30. But his counsel did say: "I ___ object to the use of the phrase `changing its color' in connection with the standard of identity." Despite the garble (the "standard of identity" concept related to a different set of counts not involving color), we think that the district court likely understood the thrust of the objection.  This takes us to the question whether the district court was right in glossing the regulation to exclude from the definition of "processing aid" an ingredient that "change[s] [the food's] color." However, Randazzo offers nothing--by way of textual analysis, precedent, administrative interpretation, policy argument, or anything else--to support his underlying position, namely, that an ingredient that merely brings out a supposedly natural color is a processing aid. The government's reading of the regulations is not self- evidently wrong; indeed, the government now suggests that the "change of color" instruction was actually too favorable to the defense (but the government proposed the language).6 In  ____________________ 6The government relies for its new contention upon another regulation describing "the physical or technical functional effects" for which "ingredients may be added to -20- -20- all events, it is the appellant's responsibility to make some showing that an error has been committed. United States v. ______________ Hurley, 63 F.3d 1, 11 (1st Cir. 1995), cert. denied, 64 USLW ______ _____ ______ 3604 (U.S., Mar. 25, 1996). We have no basis here for finding that the instruction was error and that is enough to decide this case. Affirmed. ________  ____________________ foods," which includes among them "[s]ubstances used to impart, preserve, or enhance the color or shading of a food . . . ." 21 C.F.R. 170.3(o)(4). -21- -21- APPENDIX The following briefly describes the evidence of uncharged wrongs admitted at trial: 1. There was evidence that the Company used sugar in processing shrimp for an unspecified period before it was discontinued in favor of saccharin in 1989. No one testified expressly that this use of sugar was illegal, but this was a likely inference, given that the evidence showed the sugar was not identified on the product label and that sugar was among the ingredients concealed by falsified brine charts.  2. Testimony showed that STP was used in the Company's frozen breaded shrimp from the 1970s, in violation of federal regulations and government contract provisions. This conduct clearly preceded the indictment period for count 1, which began in 1989, although the government argues that it was within the scope of the allegations in count 79, which stated that the additive had been used in commercially sold shrimp "from a time not known to the grand jury but at least June 1983."  3. There was evidence that, during the years alleged in the tax counts, Randazzo failed to report as income on his personal tax returns both the cash sums he allegedly took from the Company's retail store and the personal services provided by an assistant at Company expense.  4. Testimony by a Company accountant tended to show that Randazzo engaged in the corporate tax count offenses prior to the indictment period. Specifically, the accountant told Randazzo in a 1985 conversation that something was suspect about the bookkeeping for the cash retail sales of shrimp, and also inquired as to what Company services were being performed by the Randazzo family assistant. Randazzo allegedly told him it was none of his business.