UNITED STATES of America,
Plaintiff,

v.

K. Glenn SHAW, Eileen B. Aird, and
Louise Verde, Defendants.

No. Crim.A.99–10044–REK.

United States District Court,
D. Massachusetts.

Sept. 11, 2000.

well, Dwyer & Collora, Boston, MA, for Glenn K. Shaw, defendant.

Nancy Silverman, Martha Purcell Rogers, Ober Kaler, Washington, DC, for Eileen B. Aird, defendant.

Sollers J. Sedwick, III, Michael E. Meece, King & Spalding, Washington, DC, Craig M. Wolff, King & Spalding, Washington, DC, for Louise Verde, defendant.

Susan G. Winkler, Diane C. Freniere, U.S. Attorney's Office, Boston, MA, Susan C. Hanson-Philbrick, U.S. Attorney's Office, Boston, MA, for U.S.

### Memorandum and Order

KEETON, District Judge.

### I. Pending Motions

Pending before the court are the following motions:

(1) Defendants' Motion for Reconsideration of Magistrates' Order on Pretrial Motions (Docket No. 124, filed March 13, 2000) with Memorandum in Support (Docket No. 125). The United States has filed an Opposition (Docket No. 130, filed on March 21, 2000).

(2) Defendant K. Glenn Shaw's Motion for Relief from Misjoinder Pursuant to Fed.R.Crim.P. 8(b) (Docket No. 113, filed February 29, 2000) with Memorandum in Support (Docket No. 114);

(3) Defendant Aird's Motion for Relief from Misjoinder (Docket No. 115, filed February 29, 2000) with Memorandum in Support (Docket No. 116);

(4) Defendant Louise Verde's Motion for Relief from Misjoinder with K Glenn Shaw (Docket No. 117, filed February 29, 2000) with Memorandum in Support (Docket No. 117).

Douglas Farquhar, Hyman, Phelps & McNamara, P.C., Washington, DC, Maria R. Durant, David M. Osburne, Dwyer & Collora, Boston, MA, William H. Kettle-

The United States has filed an Opposition to Defendants' Motions for Relief from Misjoinder (Docket No. 131, filed March 29, 2000).

## II. Procedural and Factual History

### A. Introduction

For an explanation of the procedural background of this complex medicare fraud case, see this court's memoranda issued on June 19, 2000 (Docket No. 165) and on August 8, 2000 (Docket No. 176).

More about the factual background relevant to the pending motions is stated below. Unless otherwise stated, the following recitation of alleged relevant facts is from the superseding indictment (*see* Docket No. 46).

### B. The Actors

National Medical Care (NMC), a health care company, provided through its various subsidiaries, an array of products and services to patients diagnosed with end-state renal disease ("ESRD"). From in or about 1989 through on or about December 3, 1993, Dr. K. Glenn Shaw was President of NMC Medical Products, Inc. (MPD), a wholly owned subsidiary of National Medical Care, Inc. (NMC). MPD manufactured, sold, and distributed products used in kidney dialysis, a primary treatment of ESRD. MPD sold these dialysis related products not only to the NMC-owned clinics, called Bio–Medical Applications (BMAs) but also to dialysis facilities not owned by NMC.

NMC also had another division, called the LifeChem division (LifeChem), that provided clinical laboratory blood testing services both to the BMAs and to dialysis clinics not owned by NMC. LifeChem also specialized in performing laboratory blood tests for ESRD patients.

From August 1990 through January 1993, Eileen Aird was the General Manager of LifeChem. From January 1993 until October 1996, Aird was the president of LifeChem.

Louise Verde was the Product Manager for LifeChem from 1987 until late 1993. From late 1993 until October 1997, Verde was Senior Product Manager in Marketing at LifeChem.

Shaw retired from NMC's employ in 1993.

On October 1, 1996, Fresneius Medical Care A.G., a German corporation, purchased NMC, and the entity formerly known as NMC continued doing business in North America under the name Fresneius Medical Care—North America.

### C. The Program

In 1965, Congress enacted Title XVIII of the Social Security Act ("The Medicare Program") authorizing the federal government to pay for the cost of certain medical services, including clinical laboratory blood testing services, for persons aged 65 and older. By amendment in 1972, Congress extended the coverage of the Medicare Program to include paying, under most conditions, for the cost of certain medical services for a person suffering from ESRD, regardless of the person's age.

The Department of Health and Human Services (HHS) administers the Medicare Program through the Health Care Financing Administration (HCFA). In discharging its duties, HCFA makes contracts with private insurance companies ("carriers") to receive, review, and pay lawful claims for reimbursement for the provision of clinical laboratory services to Medicare Program beneficiaries.

HCFA mandates that all ESRD patients undergo, in addition to dialysis, monthly blood testing in order to monitor the efficiency of the dialysis treatment. These tests are performed by clinical laboratories, like LifeChem, and classified by Medicare as "routine tests." The Medicare Program reimburses dialysis clinics directly for dialysis treatments and for routine tests through a monthly fixed payment per patient, per treatment. Because LifeChem was an approved provider under the Social Security Act, LifeChem was authorized to submit directly to the carriers under contract with HCFA lawful claims

for reimbursement for these routine tests as well as other tests that were ordered by physicians and that were reasonable and medically necessary in the diagnosis and treatment of Medicare treatment beneficiaries.

For ESRD patients who received dialysis treatments at a dialysis unit or center, Medicare paid for the dialysis that the patient needed for the entire month through a monthly, capitated payment with money from the Medicare Program Trust Funds. That monthly payment was known as the "composite rate payment" and was usually a fixed amount that included reimbursement for the cost of dialysis as well as the cost of the routine tests. The "composite rate payment" for dialysis did not include payment for any non-routine test (any additional laboratory test required to diagnose or treat non-ESRD medical problems, except those that were labeled "Medicare allowable tests" by HCFA). The Medicare Program separately paid for non-routine tests by directly reimbursing the clinical laboratory on a fee-for-service basis. To obtain reimbursement for non-routine tests, other than Medicare allowable tests, a clinical laboratory like LifeChem would have to certify to HCFA, through the carrier, that the tests were medically necessary.

### D. LifeChem's Marketing Strategy

In or about March 1991, LifeChem offered for sale to dialysis physicians, and received reimbursement from Medicare for, a group of tests that LifeChem called the CA/PHOS Product. The CA/PHOS Product consists of a calcium test, a phosphorus test, a calcium/phosphorus product calculation, and a magnesium test. A magnesium test was also offered separately. Medicare covered the cost of non-routine magnesium tests that physicians considered to be medically necessary. Before March 1991, a calcium/phosphorus product calculation was not available to doctors ordering tests from LifeChem. Doctors considered the new calcium/phosphorus product calculation a convenience and an improvement in the products provided by LifeChem, but the calcium/phosphorous product calculation was not medically necessary and was not lawfully reimbursable by Medicare.

From in or about the mid–1980s, LifeChem offered for sale to dialysis physicians, and received reimbursement from Medicare for, a group of tests that LifeChem called a Hepatitis panel that consisted of, among other tests, a Hepatitis B surface antigen test, a Hepatitis B surface antibody test, and a Hepatitis B IGM Core test. These tests were also sold separately. Medicare paid for clinical laboratory blood tests for one annual Hepatitis B surface antibody or IGM Core test (but not both) as a Medicare Allowable test for all ESRD patients. Medicare would pay for an additional antibody and IGM Core test in the year as long as the test was medically necessary for the treatment or diagnosis of a patient's medical condition *other than* ESRD.

Before August 1991, BMA physicians infrequently ordered the Hepatitis panel, and both BMA and non-BMA physicians rarely, if ever, separately ordered an IGM Core test from LifeChem.

LifeChem also offered Hepatitis C antibody tests but, before August 1991, few physicians ordered Hepatitis C tests from LifeChem. Medicare would pay for the Hepatitis C antibody test as long as the test was medically necessary for the treatment or diagnosis of a patient's medical condition other than ESRD. Repeat testing for Hepatitis C antibodies for ESRD patients who had previously tested positive was not regarded as medically necessary.

### E. The Conspiracy Charges

#### 1. K. Glenn Shaw

Shaw has been indicted for conspiring, under 18 U.S.C. § 371, to commit the offense of violating what has been called the Medicare Anti–Kickback Statute (hereinaf-

ter "the anti-kickback statute"). That statute reads, in relevant part,

(b) Illegal remunerations

(1) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a–7b(b) (1999).

Specifically, the indictment charges that Shaw, as president of MPD, conspired to pay remuneration to independent dialysis clinics for the purpose of inducing those clinics to use LifeChem's laboratory services for, among other things, non-routine tests and medically unnecessary tests that were in whole or in part reimbursable under the Medicare Program, all in violation of the health care anti-kick back statute, 42 U.S.C. § 1320a–7b(b)(2)(B).

The Government alleges that the inducements for referring orders for LifeChem's services took the form of rebates and special pricing, grants, entertainment and hunting trips, and write-offs of bad debt for blood laboratory tests of indigent and HMO patients. With regard to the rebates and special pricing—seventy of the alleged illegal instances of remuneration— the Government alleges that beginning in 1987, Shaw, as well as other CEOs at MPD, directed employees to discontinue the practice of expressly stating that pricing or rebates on MPD's dialysis related products was contingent upon receipt by LifeChem of referrals for laboratory blood testing services, while at the same time instructing the same employees to continue to provide rebates or special pricing on MPD products in exchange for receiving referrals from the dialysis facilities to Life-Chem for the laboratory blood testing. The seventy instances of alleged illegal remunerations are, defendant contends, legal "price reductions" in the form of credits applied to past due balances and future purchases of medical products purchased by the independent dialysis clinics. See Docket No. 102 at 5. They are listed in the superseding indictment at paragraph 73(g).

The other eight instances of alleged illegal remuneration are in the form of educational or research grants, debt write-offs, consulting fees, and entertainment. As an example, the Government alleges that in the early 1990s, Shaw approved payments by MPD for lavish holiday entertainment parties, including a yacht rental worth thousands of dollars, for an external dialysis facility, in exchange for referrals of that facility's laboratory business to LifeChem.

### 2. Eileen Aird and Louise Verde

Aird and Verde have been indicted for conspiring, under 18 U.S.C. § 371, to defraud the United States, in particular, the HCFA and the Medicare Program. Section 371 of Title 18 of the United States Code states, in relevant part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or impris-

oned for not more than five years, or both.

18 U.S.C. § 371.

In particular, Count One charges that from in or about 1991 through in or about 1996, Aird and Verde violated 18 U.S.C. § 371 as they

> did knowingly, intentionally and willfully combine, conspire, confederate and agree to defraud the United States, and its agency, the HCFA in its administration of the Medicare Program, by engaging in deceit, craft and trickery in dealing with physicians, dialysis center staff, and others, in order to cause physicians to order laboratory blood tests from LifeChem that were not medically necessary for the treatment or diagnosis of the physician's patients; and thereby to enable LifeChem to unlawfully receive reimbursement from the Medicare Program for medically unnecessary laboratory tests performed by LifeChem on blood drawn from dialysis patients, all for the purpose of evading and frustrating efforts by the Medicare Program to pay only for medically necessary clinical laboratory blood testing on Medicare Program beneficiaries.

Docket No. 46 (Superseding Indictment) at ¶ 30.

The superseding indictment describes the means of the conspiracy as purposeful manipulation of ordering patterns of blood work by physicians that enabled LifeChem to bill Medicare directly for thousands of blood tests (costing millions of dollars) that defendants knew were not lawfully reimbursable under Medicare. The indictment charges that the manipulation occurred in two primary ways: bundling tests and using specially crafted ordering forms. For example, the superseding indictment alleges that Aird and Verde bundled tests (such as the magnesium test with the CA/PHOS Product, the Hepatitis C antibody test with the Hepatitis Panel, and the IGM Core test with the Hepatitis Panel) in order to cause physicians to order both Medicare reimbursable and non-reimburs-

able tests that were medically unnecessary. *See id.* at ¶ 33a–c. Also, the indictment alleges that Aird and Verde crafted LifeChem's paper requisition laboratory test order forms in a way that made it difficult for physicians to order LifeChem's CA/PHOS Product without the bundled magnesium test, or LifeChem's Hepatits Panel without the bundled Hepatitis C test and the Hepatitis IGM Core test. *See id.* at ¶ 33d. These forms discouraged physicians from ordering only those tests that were medically necessary and misled physicians by falsely suggesting to them that ordering LifeChem's laboratory blood tests in a panel was more economical than selectively ordering individual blood tests. *See id.* at ¶ 33e. The forms also hid from the ordering physicians the fact that LifeChem was charging Medicare for each of the bundled and medically unnecessary tests at the Medicare fee schedule, thereby preventing physicians from making informed decisions about which tests to order and how the tests would be paid for. *See id.* The indictment also alleges that, in addition to using the paper requisition forms, defendants used computerized test-ordering software that LifeChem supplied to physicians and installed in the BMAs. Defendants allegedly used this software to facilitate ordering of laboratory work and to serve the same goals as use of the paper order forms served. *See id.* at ¶ 33g–h.

The superseding indictment also charges that Aird and Verde

> misled physicians by suggesting to them that BMA medical policy required or encouraged performance of LifeChem Hepatitis panels, when, to the contrary, the Clinical Services Division at NMC, the division with oversight over BMA medical policies, recommended against the use of LifeChem's Hepatitis Panel[, and] obtained diagnosis codes, known as ICD–9 codes, for Hepatitis panels and CA/PHOS Product from dialysis clinics to enable LifeChem to provide medical justification to the Medicare carrier for the Non–Routine Tests, without disclos-

ing to the Medicare carrier that not every test on the Hepatitis panel or CA/PHOS Product had been ordered separately by the physician as being medically necessary

all in an effort to defraud the United States. *Id.* at ¶ 33i–j. ICD–9 codes (International Classification of Diseases Codes) operated as certification that tests ordered were reasonable and necessary for the diagnosis or treatment of illness or injury. Under 42 U.S.C. § 1395y(a)(1)(A), carriers were required to exclude from reimbursement any tests that were "not reasonable and necessary for the diagnosis or treatment of illness or injury."

The indictment charges that in furtherance of the conspiracy, Aird and Verde directed and caused LifeChem and certain of its employees to submit to Medicare hundreds of thousands of claims for payment for bundled Hepatitis B IgM Core tests, Hepatitis C antibody tests, and magnesium tests, knowing that the tests were medically unnecessary and without disclosing that lack of medical necessity to the Medicare Program. *See id.* at ¶¶ 35–37. As a result, Aird and Verde caused LifeChem to receive millions of dollars from Medicare to which LifeChem was not entitled. *See id.* Illustrations of the claims submitted are at paragraphs 35, 36, and 37 of the superseding indictment.

Counts Ten through Seventeen (two through nine having been dismissed by the government on February 22, 2000) charge that from in or about May 1991 through in or about 1997, Aird and Verde violated 18 U.S.C. §§ 2 and 1341 as they

knowingly, willfully, and unlawfully devised and intended to devise a scheme and artifice to defraud the United States through its agency HCFA, to obtain money from the Medicare Program to which LifeChem was not entitled, by means of false and fraudulent pretenses, representations, and promises, and by the concealment of material facts from HCFA and its Medicare carrier, physicians, and others, concerning claims for

reimbursement for thousands of medically unnecessary laboratory blood tests that were performed by LifeChem ... [and] for the purpose of executing such scheme and artifice, did place and cause to be placed in an authorized depository for mail matter, and aided and abetted the mailing of, the items set forth below, such items mailed from and to the locations specified.

*Id.* at ¶¶ 40, 68. The scheme described in paragraphs 41 through 68 is much like the conspiracy described above for Count One.

### III. Motions for Relief from Misjoinder

Defendant K. Glenn Shaw moves that this court grant relief from misjoinder by severing his trial on Count 18 of the Superseding Indictment from the trial of co-defendants Eilieen Aird and Louse Verde on Counts 1 and 10 through 17. Likewise, defendants Aird and Verde move this court to grant relief from misjoinder of Counts 1 and 10 through 17 with Count 18 of the Superseding Indictment. I consider these motions together because the parties request identical relief, and present similar arguments, and because the government, treating the three motions together, responded to all three motions in one opposition with a unified argument.

 Federal Rule of Criminal Procedure 8(b) under which all three defendants seek relief, states in relevant part:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P. 8(b). The defendant has the burden of persuading the trial court that joinder is inappropriate in the circumstances of the particular case. "In the

ordinary case, a rational basis for joinder of multiple counts should be discernible from the face of the indictment." *United States v. Natanel,* 938 F.2d 302, 306 (1st Cir.1991). If the trial court determines that the defendants are improperly joined under Fed.R.Crim.P. 8(b), the trial court must sever the defendants and order separate trials. *See id. See also King v. United States,* 355 F.2d 700, 703 (1st Cir. 1966) (stating that "any joinder which does not fall within [Rule 8] is per se impermissible").

The government's theory in this case is that the indictment charges two related conspiracies, the proof of which will overlap in parts and which are relevant to each other in other parts. The government alleges that the two conspiracies are sufficiently related to justify joinder because both aimed at committing fraud against Medicare through the sale of NMC's products relating to the treatment and diagnosis of ESRD. The government states that witnesses who will offer proof against K. Glenn Shaw will also offer proof against Aird and Verde. Medical testimony regarding the nature of ESRD and the services provided by NMC will be required for proof of the charges against all three defendants. Also, extensive testimony about NMC's profitability and marketing strategies will be required for proof of the charges against all three defendants. General testimony about the nature of the Medicare program would be elicited against all three defendants as well. All this duplication, avers the government, demonstrates that joinder is appropriate and would promote judicial economy, as well as allow "the jury to draw consistent conclusions about common factual questions." Docket No. 131 at 8 (citing *United States v. MacDonald & Watson Waste Oil,* 933 F.2d 35, 60 (1st Cir.1991)).

■ Despite what the government contends will be duplicative testimony, my provisional view, based on the record now before me, is that K. Glenn Shaw has been misjoined under Fed.R.Crim.P. 8(b) with defendants Aird and Verde. On the facts as alleged in the indictment in light of the relevant case law cited below, it is my present view that separate trials for defendant K. Glenn Shaw on Count 18 and for defendants Aird and Verde on Counts 1 and 10 through 17 are appropriate and should be ordered. My reasons for this view of the matter are stated immediately below.

First, prejudice. At the Case Management Conference of May 25, 2000, the government represented that the trial of the three defendants might last as long as two months. Even tried separately, however, the trial of each conspiracy will likely be lengthy. Several extra days of duplicative testimony, as the government states, would be necessary if the defendants' motions for relief from misjoinder were granted. But that is a small price to pay to prevent significant prejudice to the defendants and to protect the fairness of the criminal trial process. *See King v. United States,* 355 F.2d 700, 703 (1st Cir.1966). Given the facts of this case as stated in the indictment, two separate trials on the two separate conspiracies charged are appropriate even though some proof that is offered in one trial will be offered also in the other. The burden on the court and the parties to try the conspiracies separately is outweighed by the prejudice to the defendants should all three be tried together.

Second, relatedness. The two conspiracies charged in the indictment are not sufficiently related to warrant trying them together. *See* Fed.R.Crim.P. 8(b) (allowing joinder only if "defendants ... charged in the same indictment or information ... are alleged to have participated in the same act or transaction or in the same series of acts or transactions"). The government concedes that the conspiracies charged are distinct. *See* Docket No. 131 at 2–3. All defendants are charged with conspiracy under 18 U.S.C. § 371, but Shaw is charged with conspiring to commit an offense against the United States, to wit, to violate the so-called Medicare Anti–

Kickback Statute (42 U.S.C. § 1320a–7b(b)) by offering illegal remunerations such as rebates and kickbacks in exchange for Medicare reimbursable services, and Aird and Verde are charged with conspiring to defraud the United States by inducing the purchase of blood tests knowing they were unnecessary and thus that they were not reimbursable under Medicare. Beyond the fact that all defendants worked for the same umbrella company, NMC, and were in the business of selling NMC's products (although concededly under different subdivisions of the corporation) with the purpose of making a profit for the company, the underlying facts supporting the conspiracy claims are substantially unrelated. *See United States v. Turkette*, 632 F.2d 896, 907–08 (1st Cir., 1980) *rev'd on other grounds*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (stating that "[r]elatedness of offenses can be established by demonstrating that *essentially the same facts* must be shown for each of the consolidated crimes") (emphasis added); *United States v. Andrews*, 765 F.2d 1491, 1496 (11th Cir.1985) (stating that Rule 8(b) requires a showing that the charges involve a *"substantial identity of facts and participants"*) (emphasis added). *See also United States v. Nicely*, 922 F.2d 850, 853 (D.C.Cir.1991) (stating that "the mere fact that two conspiracies have overlapping memberships will not authorize a single indictment if the conspiracies cannot be tied together into one conspiracy, one common plan or scheme").

As can be appropriately inferred from the forty-five page indictment, evidence proffered at trial that would demonstrate that Shaw as CEO of NMC offered illegal remunerations, as those are defined by 42 U.S.C. § 1320a–9b(b)(2)(B), in a conspiracy to commit an offense against Medicare, are not significantly related to offers of proof that would show that Aird and Verde at LifeChem developed and orchestrated a marketing strategy for panels of blood tests the purpose of which was allegedly to trick and deceive doctors into ordering more tests than were medically necessary.

The parts of the offers of proof that the government claims overlap between the two conspiracies are generalized testimony regarding the nature of the company and its products and how the Medicare Program works. The government claims that it will need the same witnesses to testify against all three defendants. Even if that is so, however, the substance of their testimony will differ, depending on which conspiracy the testimony aims to prove.

Third. Shaw is not mentioned in relation to the conspiracy charged against Verde and Aird, except to describe generally the company's organization and purpose. Also, when the indictment describes the blood test panels allegedly developed and marketed by Aird and Verde, Shaw is referred to only as to his approving, as the president of MPD, the purchase of laboratory equipment and the structure of sales commissions. *See* Docket No. 46 at ¶¶ 46–48, 58–60. Neither of these references is an integral part of the conspiracy charged against Aird and Verde. Likewise, the facts alleged that charge Shaw with a conspiracy to violate the Medicare Anti–Kickback statute do not relate to or even mention Aird and Verde. The indictment contains no allegation that tricking physicians to order medically unnecessary blood tests, the core of charge against Aird and Verde, was at all related to the illegal remunerations such as rebates and kickbacks that Shaw allegedly offered to NMC's customers.

Fourth. The view that overlap between the two conspiracies was minimal and that the defendants had disparate roles in the two distinct conspiracies makes sense, particularly, in light of the mental states that must be proved to establish the crimes charged. To prove the conspiracy alleged in Count One against Aird and Verde, the government must prove that Aird and Verde developed the marketing strategies of the blood test panels with the purpose of tricking doctors into ordering medically unnecessary tests to be submitted for re-

imbursement under Medicare. In contrast, to establish the conspiracy alleged in Count 18 against Shaw, the government must prove that Shaw offered illegal remunerations, as those are defined by the statute, with the specific purpose of inducing referrals of his company's services.

In sum, the two conspiracies consist of sets of acts and transactions that are distinct from one another. Describing them, as the government does, as together constituting a common scheme or plan that is sufficiently interrelated to warrant a joint trial without significant prejudice to the defendants, significantly understates the factual support that, under applicable law, is required to prove the crimes charged. *See, e.g., United States v. Randazzo,* 80 F.3d 623, 628 (1st Cir.1996).

For these reasons, my present view, on the record now before me, is that defendants' motions for relief from misjoinder should be granted and that two trial dates will be needed. The two trial dates of November 13, 2000 and January 8, 2000, provisionally scheduled at the Case Management Conference of May 25, 2000 for K. Glenn Shaw and Eileen Aird and Louise Verde, respectively, are confirmed in the order below.

## IV. Motion for Reconsideration of Magistrate's Decision on Pre–Trial Motions

### A. Magistrate's Ruling and Governing Standard of Review

Magistrate Cohen made the following orders regarding defendants' pre-trial motions at issue in the now pending motion for reconsideration:

> B. *Defendants' Motion for More Detailed Description of Crimes, Wrongs or Other Acts (# 80):* Motion denied.
>
> . . .
>
> F. *Defendants' Reply to Government's Response Concerning the Production of Grand Jury Exhibits (# 93):* Treating this "Reply" as a motion requiring the government to specifically identify those documents which the government has produced or will produce as having previously been placed before the grand jury, the motion is denied. The government is under an obligation under Local Rules of this Court as well as under Rule 16, F.R.Crim.P., to produce certain categories of documents, regardless of whether the documents were ushered before a grand jury. It is not, however, required to put pen to paper indicating which of the documents so produced were shown or otherwise exhibited to the grand jury.
>
> . . .
>
> J. *Defendants' Motion for Discovery Concerning Qui Tam Action (# 109):* Motion denied. To the extent that defendants wish to peruse the pleadings and other documents filed in the public record in the case entitled *United States ex rel. Jay Buford, et al. v. Lifechem, Inc., et al.,* Civil Action No. 95–10742–NG (D.Mass.), those pleadings and/or documents are public records and may be examined at the Clerk's office. To the extent that defendants wish to peruse other documents not filed in that case, the defendants have provided no justification for requiring the government to provide that information.

Docket No. 120 at 2, 3, 6.

The standard by which a district court reviews discovery rulings by a magistrate judge is established by 28 U.S.C. § 636, which states that "[a] judge of the court may reconsider any pretrial matter ... where it has been shown that the magistrate's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A).

### B. Analysis of Defendants' Arguments

#### 1. *Rule 404(b) Discovery*

The United States provided, in accordance with Fed.R.Evid. 404(b) (requiring "reasonable notice" in advance of trial) and Local Rule 117.1(A)(4)(b) (requiring 21 day notice), the following list of possible evidence it would seek to admit at trial against the defendants as examples of other crimes, wrongs, or bad acts:

1. Dr. Shaw and Eileen Aird's knowing participation in a conspiracy to deliberately submit false and fraudulent billings for laboratory tests to the Medicare Program for individual laboratory tests performed as part of chemistry panels, from in or about February, 1991 through in or about July, 1992, such tests billed to Medicare from LifeChem's facility in Northvale, New Jersey.

2. Dr. Shaw's knowing participation in the conspiracy to defraud Medicare by causing doctors to order medically unnecessary tests, as further described in Count 1 of the Superceding Indictment.

3. Dr. Shaw's alteration and falsification of scientific data submitted to the Food and Drug Administration (FDA) in 1993 in connection with the Biocare dialyzer.

4. Dr. Shaw's, Eileen Aird and Louise Verde's concealment from their superiors of the continued submission of false and fraudulent billings to the Medicare Program for individual laboratory tests performed as part of chemistry panels, from in or about February, 1991 through in or about mid–1993, from both Northvale and Rockleigh, New Jersey.

5. Dr. Shaw's concealment from his superiors of the abysmal conditions at Company plants manufacturing FDA-approved devices customer product complaints, and out-of-box product failures from at least in or about 1992 through 1993.

6. Dr. Shaw's effort to alter and falsify results of Company investigations into complaints of potentially life threatening deficiencies in bloodlines manufactured by the Company in or about 1993.

Docket No. 125 at 5.

■ Defendants complain that the magistrate judge did not provide any reason or explanation for his denial of their motion. *See id.* at 4. Defendants fail, however, to provide a persuasive legal argument for why the denial in the circumstances of this case is clearly erroneous or contrary to law. Defendants' primary argument is that what constitutes "reasonable" disclosure under Fed.R.Evid. 404(b) depends on the circumstances of the case, and that because this case is so complex, fairness dictates that the government's proffers of other crime, wrong, or act evidence be particularly detailed. Defendants argue that the government's failure to provide descriptions of their possible 404(b) evidence in other than the very broad terms reproduced above does not comply with the rule.

Federal Rule of Evidence 404(b) states that evidence of other crimes, wrongs, or acts may be admissible for certain purposes "provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Fed.R.Evid. 404(b). The disclosures provided by the government meet the rule's requirement of providing notice of the "general nature of any such evidence." Any deficiencies in detail of which the defendants complain may lead to a trial court ruling against the government as to the admissibility of one or more items of evidence offered at trial, but do not run afoul of the government's disclosure obligations now, several months before even the final pre-trial conference.

The denial of defendants' motion for reconsideration on this issue is not a ruling on the admissibility of any of the evidence disclosed by the government in its Rule 404(b) proffers. Defendants are not prejudiced in any way in the exercise of their opportunity to object on a legitimate claim of surprise, or on other legitimate grounds.

2. *Defendants' Request for the Government to Produce all Pleadings and Other Documents in Related Qui Tam Action*

■ Defendants' primary argument in support of its position that the government

should be required to disclose all pleadings and other documents filed in the civil False Claims Act law suit initiated by *qui tam* relators Russell Davis, William Schoff and Jay Buford (civil action *United States ex rel. Jay Buford et al. v. Lifechem, Inc. et al.*, No. 95–10742–NG), is that those documents "likely contain exculpatory evidence" that might aid the defendants in the criminal action. Docket No. 125 at 9–10. Defendants are aware that many of the documents requested are under seal in the *qui tam* action but claim that the seal has served its purpose and no reason exists to maintain it any longer. *See id.* at 10. Defendants also state that they do not ask this court to unseal documents in the *qui tam* action. Instead, they ask only that the government produce the exculpatory pleadings and related documents in its own possession. *See id.*

Magistrate Judge Cohen's ruling on this issue, denying the defendants' request, is not clearly erroneous or contrary to law. Magistrate Judge Cohen's ruling made clear that the defendants are not prohibited from reviewing the file of the *qui tam* action that is in the public records and that defendants have not made any showing of entitlement to any documents under seal or not filed in that case. To the extent that defendants claim that the documents may contain exculpatory evidence to which they are entitled under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny, the government must meet its obligations under those rules as interpreted in applicable case law. *See, e.g.,* Local Rule 116.1(a)(5).

For these reasons, the defendants' motion to reconsider the Magistrate Judge's ruling on the discovery request related to the *qui tam* action will be denied.

3. *Defendants' Request that the Government Identify Any Documents Produced to Defendants that were Placed before the Grand Jury*

▮ Recognizing that the applicable rules do not expressly require identifica-

tion of grand jury exhibits, the defendants nevertheless request that, under the particular circumstances of this case, in which over 700 boxes containing over two million pieces of paper were produced by the government to the defendant, the government narrow its proffer so that the defendants are afforded the right to prepare adequately for trial as due process requires.

Magistrate Judge Cohen's ruling denying defendants' request that the government identify all the grand jury exhibits among the documents proffered to defendants is not contrary to law. Magistrate Judge Cohen stated correctly that the government is not required to "put pen to paper indicating which of the documents so produced were shown or otherwise exhibited to the grand jury." Docket No. 120 at 3. The Magistrate also noted, however, that the government is nonetheless under "an obligation under the Local Rules of this Court as well as under Rule 16, F.R.Crim.P., to produce certain categories of documents, regardless of whether the documents were ushered before a grand jury." *Id.*

In fulfilling its duty to disclose documents to the defense, the government may also be unduly burdening the defense with so much paper that they are incapable of adequately responding in preparation for trial. The volume of documents in this case is burdening all those involved. It is not the practice of this court, however, to interfere with the discovery process between parties. Nevertheless, if, as the time for trial grows near, the defense wishes to assert that they have adequately supported objections to the admission of evidence that they can show has been, as they claim (*see* Docket No. 125 at Exh. C), buried among the two million pieces of paper, they may file appropriate motions at that time, asserting due process violations associated with unnecessarily burdensome discovery production the purpose of which is to inhibit the defense from countering the government's case-in-chief.

For these reasons, defendants' motion for reconsideration of Magistrate Judge Cohen's rulings will be denied.

## ORDER

For the foregoing reasons, it is hereby ORDERED:

(1) Defendants' Motion for Reconsideration of Magistrates' Order on Pretrial Motions (Docket No. 124, filed March 13, 2000) is DENIED.

(2) Defendant K. Glenn Shaw's Motion for Relief from Misjoinder Pursuant to Fed.R.Crim.P. 8(b) (Docket No. 113, filed February 29, 2000) is ALLOWED provisionally, as explained in the foregoing Memorandum.

(3) Defendant Aird's Motion for Relief from Misjoinder (Docket No. 115, filed February 29, 2000) is ALLOWED provisionally, as explained in the foregoing Memorandum.

(4) Defendant Louise Verde's Motion for Relief from Misjoinder with K Glenn Shaw (Docket No. 117, filed February 29, 2000) is ALLOWED provisionally, as explained in the foregoing Memorandum.

(5) Unless cause is shown by a party, or is recognized by the court on its own initiative, the trial of charges against K. Glenn Shaw will commence on Monday, November 13, 2000 at 9:00 a.m., and the trial of charges against Eileen Aird and Louise Verde will commence on Monday, January 8, 2001 at 9:00 a.m.

(6) A Final Pretrial Conference is set for 2:30 p.m. on Friday, November 2, 2000.